**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARIA M. GONZALEZ,; LUCIANO
VALENCIA; THE INTER TRIBAL
COUNCIL OF ARIZONA, INC.;
ARIZONA ADVOCACY NETWORK;
STEVE M. GALLARDO; LEAGUE OF
UNITED LATIN AMERICAN CITIZENS
ARIZONA; LEAGUE OF WOMEN
VOTERS OF ARIZONA;
PEOPLE FOR THE AMERICAN WAY
FOUNDATION; HOPI TRIBE,
                    *Plaintiffs,*

and

BERNIE ABEYTIA; ARIZONA HISPANIC
COMMUNITY FORUM; CHICANOS POR
LA CAUSA; FRIENDLY HOUSE; JESUS
GONZALEZ; DEBBIE LOPEZ;
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; VALLE DEL
SOL; PROJECT VOTE,
                    *Plaintiffs- Appellants,*

v.

STATE OF ARIZONA; SHELLY BAKER,
La Paz County Recorder; BERTA
MANUZ, Greenlee County
Recorder; CANDACE OWENS,
Coconino County Recorder; LYNN
CONSTABLE, Yavapai County
Election Director; KELLY DASTRUP,
Navajo County Election Director;
LAURA DEAN-LYTLE, Pinal County
Recorder; JUDY DICKERSON,
Graham County Election Director;
DONNA HALE, La Paz County
Election Director; SUSAN
HIGHTOWER MARLAR, Yuma County
Recorder; GILBERTO HOYOS, Pinal
County Election Director;
LAURETTE JUSTMAN, Navajo County
Recorder; PATTY HANSEN,
Coconino County Election
Director; CHRISTINE RHODES,
Cochise County Recorder; LINDA
HAUGHT ORTEGA, Gila County
Recorder; DIXIE MUNDY, Gila
County Election Director; BRAD
NELSON, Pima County Election
Director; KAREN OSBORNE,
Maricopa County Election
Director;

YVONNE PEARSON, Greenlee County
Election Director; PENNY PEW,
Apache County Election Director;
HELEN PURCELL, Maricopa County
Recorder; F. ANN RODRIGUEZ, Pima
County Recorder, KEN BENNETT,
                  *Defendants-Appellees,*

No. 08-17094
D.C. Nos.
2:06-cv-01268-ROS
06-cv-01362-PCT-
JAT
06-cv-01575-PHX-
EHC

MARIA M. GONZALEZ; BERNIE
ABEYTIA; ARIZONA HISPANIC
COMMUNITY FORUM; CHICANOS POR
LA CAUSA; FRIENDLY HOUSE; JESUS
GONZALEZ; DEBBIE LOPEZ;
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; LUCIANO
VALENCIA; VALLE DEL SOL;
PEOPLE FOR THE AMERICAN WAY
FOUNDATION; PROJECT VOTE,
                          *Plaintiffs,*

                  and

THE INTER TRIBAL COUNCIL OF
ARIZONA, INC.; ARIZONA ADVOCACY
NETWORK; STEVE M. GALLARDO;
LEAGUE OF UNITED LATIN AMERICAN
CITIZENS ARIZONA; LEAGUE OF
WOMEN VOTERS OF ARIZONA; HOPI
TRIBE,

*Plaintiffs-Appellants,*

v.

STATE OF ARIZONA; KEN BENNETT;
SHELLY BAKER, La Paz County
Recorder; BERTA MANUZ, Greenlee
County Recorder; CANDACE
OWENS, Coconino County
Recorder; PATTY HANSEN,
Coconino County Election
Director; KELLY DASTRUP, Navajo
County Election Director; LYNN
CONSTABLE, Yavapai County
Election Director; LAURA DEAN-
LYTLE, Pinal County Recorder;
JUDY DICKERSON, Graham County
Election Director; DONNA HALE,
La Paz County Election Director;
SUSAN HIGHTOWER MARLAR, Yuma
County Recorder; GILBERTO
HOYOS, Pinal County Election
Director;

LAURETTE JUSTMAN, Navajo County
Recorder; CHRISTINE RHODES,
Cochise County Recorder; LINDA
HAUGHT ORTEGA, Gila County
Recorder; DIXIE MUNDY, Gila
County Election Director; BRAD
NELSON, Pima County Election
Director; KAREN OSBORNE,
Maricopa County Election
Director; YVONNE PEARSON,
Greenlee County Election
Director; PENNY PEW, Apache
County Election Director; HELEN
PURCELL, Maricopa County
Recorder; F. ANN RODRIGUEZ, Pima
County Recorder,
                *Defendants-Appellees,*

No. 08-17115
D.C. No.
2:06-cv-01268-ROS
OPINION

Appeals from the United States District Court
for the District of Arizona
Roslyn O. Silver, Chief District Judge, Presiding

Argued and Submitted
June 21, 2011—Pasadena, California

Filed April 17, 2012

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Pamela Ann Rymer, Susan P. Graber, Marsha S. Berzon,
Johnnie B. Rawlinson, Richard R. Clifton, Jay S. Bybee,
Sandra S. Ikuta, N. Randy Smith, and Mary H. Murguia,
Circuit Judges.[1]

---

[1]Judge Rymer participated in oral argument and deliberations but
passed away before joining any opinion.

Opinion by Judge Ikuta;
Concurrence by Chief Judge Kozinski;
Concurrence by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Rawlinson

## COUNSEL

Nina Perales, Esq. (argued), Mexican American Legal Defense and Educational Fund, San Antonio, Texas, for plaintiffs-appellants Jesus Gonzalez, et al.

Jon M. Greenbaum, Esq. (argued), Robert A. Kengle, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., David J. Bodney, Esq., Steptoe & Johnson, LLP, Phoenix, Arizona, David B. Rosenbaum, Esq., Thomas L. Hudson, Esq., Osborn Maledon, P.A., Phoenix, Arizona, Joe P. Sparks, Esq., The Sparks Law Firm, Scottsdale, Arizona, Daniel B. Kohrman, Esq., AARP, Washington, D.C., for plaintiffs-appellants The Inter Tribal Council of Arizona, et al.

Samuel R. Bagenstos (argued), DOJ, Washington, D.C., for amicus curiae United States.

Thomas C. Horne (argued), Attorney General, Phoenix, Arizona, Mary O'Grady, Solicitor General, Phoenix, Arizona, for defendant-appellee Ken Bennett.

## OPINION

IKUTA, Circuit Judge:

Proposition 200 requires prospective voters in Arizona to provide proof of U.S. citizenship in order to register to vote,

*see* Ariz. Rev. Stat. § 16-166(F) (the "registration provision"), and requires registered voters to show identification to cast a ballot at the polls, *see* Ariz. Rev. Stat. § 16-579(A) (the "polling place provision"). This appeal raises the questions whether Proposition 200 violates § 2 of the Voting Rights Act of 1965 (VRA), 42 U.S.C. § 1973, is unconstitutional under the Fourteenth or Twenty-fourth Amendments to the Constitution, or is void as inconsistent with the National Voter Registration Act of 1993 (NVRA), 42 U.S.C. §§ 1973gg *et seq.* We uphold Proposition 200's requirement that voters show identification at the polling place, but conclude that the NVRA supersedes Proposition 200's registration provision as that provision is applied to applicants using the National Mail Voter Registration Form (the "Federal Form") to register to vote in federal elections.

I

On November 2, 2004, Arizona voters passed a state initiative, Proposition 200, which (upon proclamation of the Governor) enacted various revisions to the state's election laws. As explained in more detail below, Proposition 200's registration provision amended Arizona's voter registration procedures to require the County Recorder to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz. Rev. Stat. § 16-166(F). Proposition 200's polling place provision amended Arizona's election day procedures to require voters to present specified forms of identification at the polls. *See id.* § 16-579(A).

Shortly after Proposition 200's passage, a number of plaintiffs filed lawsuits against Arizona[2] to enjoin these changes. Two groups of plaintiffs are relevant to this appeal: the Gon-

---

[2]We refer to the defendants collectively as "Arizona," even though Arizona county recorders were also named as individual defendants.

zalez plaintiffs (Gonzalez) and the Inter Tribal Council of Arizona plaintiffs (ITCA).[3]

The district court consolidated the various complaints. After the district court denied the plaintiffs' motion for a preliminary injunction, Gonzalez and ITCA appealed. *See Gonzalez v. Arizona* (*Gonzalez I*), 485 F.3d 1041, 1046 (9th Cir. 2007). Because the briefing schedule for the appeal extended beyond the 2006 election, Gonzalez and ITCA moved for an emergency interlocutory injunction (which would prevent the implementation of Proposition 200 pending the disposition of the appeal of the district court's denial of a preliminary injunction), which we granted. *See id.* After Arizona petitioned for certiorari, the Supreme Court vacated the emergency injunction and remanded the case to this court for a determination of the merits of the appeal. *See Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006) (per curiam).

On remand, Gonzalez and ITCA pursued their claim for preliminary injunctive relief only with respect to Proposition 200's registration requirement. *Gonzalez I*, 485 F.3d at 1048. The panel in *Gonzalez I* affirmed the district court's denial of the preliminary injunction, holding that Proposition 200's registration provision was not an unconstitutional poll tax and was not superseded by the NVRA. *See id.* at 1049, 1050-51.

On remand, the district court held that Proposition 200's polling place provision was not a poll tax under the Twenty-fourth Amendment and its registration provision did not conflict with the NVRA, and granted summary judgment to Ari-

---

[3]Jesus Gonzalez represented one group of plaintiffs, which consisted of individual Arizona residents and organizational plaintiffs. The Inter Tribal Council of Arizona, a non-profit organization of twenty Arizona tribes, represented another group of plaintiffs, which included the Hopi Tribe, Representative Steve Gallardo from the Arizona State House of Representatives, the League of Women Voters of Arizona, the League of United Latin American Citizens, the Arizona Advocacy Network, and People For the American Way Foundation.

zona on these claims. After trial, the district court resolved all other claims in favor of Arizona, holding that Proposition 200 did not violate § 2 of the VRA or the Equal Protection Clause of the Fourteenth Amendment and did not constitute a poll tax under the Fourteenth Amendment.

Gonzalez and ITCA appealed the district court's rulings on the NVRA and Twenty-fourth Amendment claims. In addition, ITCA challenged the court's determination that Proposition 200 was not a poll tax under the Fourteenth Amendment, and Gonzalez challenged the court's determinations on the Voting Rights Act and Equal Protection Clause claims. A three-judge panel affirmed in part and reversed in part, holding that Proposition 200's polling place provision did not violate the VRA or the Fourteenth and Twenty-fourth Amendments, but that Proposition 200's registration provision was superseded by the NVRA. *Gonzalez v. Arizona* (*Gonzalez II*), 624 F.3d 1162 (9th Cir. 2010). In deciding Gonzalez and ITCA's challenge to the registration provision, the panel overruled the contrary holding of *Gonzalez I* on the ground that an exception to the law of the case rule applied.[4]

---

[4]Under the law of the case doctrine, a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case. *See Jeffries v. Wood*, 114 F.3d 1484, 1488-89 (9th Cir. 1997) (en banc). We have recognized exceptions to the law of the case doctrine, however, where "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* at 1489 (footnote omitted) (quoting *Caldwell v. Unified Capital Corp.* (*In re Rainbow Magazine, Inc.*), 77 F.3d 278, 281 (9th Cir. 1996)) (internal quotation marks omitted). Some of our cases indicated that a three-judge panel could rely on these exceptions to overrule the law of an earlier published opinion, so long as no subsequent panel had yet relied on it. *See id.* at 1492-93; *see also Mendenhall v. NTSB*, 213 F.3d 464, 469 n.3 (9th Cir. 2000); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 786-88 (9th Cir. 2000).

We now hold that the exceptions to the law of the case doctrine are not exceptions to our general "law of the circuit" rule, i.e., the rule that a pub-

*See id.* at 1185-91. A majority of the active judges of the court voted to rehear the case en banc.

## II

We first consider Proposition 200's registration provision. *See* Ariz. Rev. Stat. § 16-166(F). Gonzalez and ITCA contend that this provision is preempted by the NVRA under both the Supremacy Clause and the Elections Clause of the U.S. Constitution. In response, Arizona relies on the Supremacy Clause's "presumption against preemption," *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), to argue that the NVRA neither expressly nor impliedly preempts state voter registration laws. Before addressing the parties' arguments, we first consider whether the framework of the Elections Clause or the Supremacy Clause properly governs this question.

## A

**[1]** The Elections Clause establishes a unique relationship between the state and federal governments. It provides:

---

lished decision of this court constitutes binding authority which "must be followed unless and until overruled by a body competent to do so," *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). To the extent that our prior cases suggested otherwise, *see Jeffries*, 114 F.3d at 1492-93; *Mendenhall*, 213 F.3d at 469 n.3; *Tahoe-Sierra Pres. Council, Inc.*, 216 F.3d at 786-88, they are overruled. This determination, however, does not affect other recognized exceptions to the law of the circuit rule. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that where "the relevant court of last resort" has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," then "a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled"); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (holding that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion").

> The Times, Places and Manner of holding Elections
> for Senators and Representatives, shall be prescribed
> in each State by the Legislature thereof; but the Con-
> gress may at any time by Law make or alter such
> Regulations, except as to the Places of chusing Sena-
> tors.

U.S. Const. art. I, § 4, cl. 1. In a nutshell, state governments
are given the initial responsibility for regulating the mechan-
ics of federal elections, but Congress is given the authority to
"make or alter" the states' regulations.

The history of the Elections Clause reveals the reasoning
behind its unusual delegation of power. Under the Articles of
Confederation, the states had full authority to maintain,
appoint, or recall congressional delegates.[5] At the Philadel-
phia Convention, delegates expressed concern that, if left
unfettered, states could use this power to frustrate the creation
of the national government, *see U.S. Term Limits, Inc. v.
Thornton*, 514 U.S. 779, 808-09 (1995), most obviously by
neglecting to hold federal elections. The Framers decided that
Congress should be given the authority to oversee the states'
procedures related to national elections as a safeguard against
potential state abuse. *See id.*; *see also* The Federalist No. 59,
at 168 (Alexander Hamilton) (Ron P. Fairfield ed., 2d ed.
1981) (explaining that "[n]othing can be more evident, than
that an exclusive power of regulating elections for the
national government, in the hands of the State legislatures,
would leave the existence of the Union entirely at their
mercy"). Over the protest of some Southern delegates,[6] the

---

[5]*See* Articles of Confederation of 1781, art. V ("[D]elegates shall be
annually appointed in such manner as the legislature of each State shall
direct . . . with a power reserved to each state, to recall its delegates
. . . .").

[6]South Carolinian delegates Charles Pinckney and John Rutledge
moved to exclude the language giving Congress this supervisory power
over the states. 5 *The Debates in the Several State Conventions, on the*

Framers approved language giving Congress power to "make or alter" the states' regulations. *See* 5 Elliot's Debates 401-02 (statement of James Madison). As modified to give Congress this supervisory power, this language became the Elections Clause.[7]

[2] Thus, the Elections Clause empowers both the federal and state governments to enact laws governing the mechanics of federal elections. The clause gives states the default authority to prescribe the "Times, Places and Manner" of conducting federal elections. Nevertheless, because Congress "may at any time by Law make or alter" the regulations passed by the state, power over federal election procedures is ultimately "committed to the exclusive control of Congress." *Colegrove v. Green*, 328 U.S. 549, 554 (1946).[8] While Congress may not

---

*Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787.* Together with the Journal of the Federal Convention, Luther Martin's Letter, Yates's Minutes, Congressional Opinions, Virginia and Kentucky Resolutions of '98-'99, and Other Illustrations of the Constitution 401 (photo. reprint 1987) (Jonathan Elliot ed., 2d ed. 1901) [hereinafter Elliot's Debates]. "The states, they contended, could and must be relied on" to regulate legislative appointments. *Id.*; *see also Vieth v. Jubelirer*, 541 U.S. 267, 275-76 (2004).

[7]Alexander Hamilton described the need for congressional oversight of the states as follows:

> [The Framers] have submitted the regulation of elections for the federal government, in the first instance, to the local administrations; which, in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety.

The Federalist No. 59, at 168.

[8]The Court has generally construed Congress's authority under the Elections Clause expansively. *See, e.g.*, *United States v. Mosley*, 238 U.S. 383, 386 (1915) (authority to enforce the right of an eligible voter to cast ballot and have ballot counted); *Ex Parte Coy*, 127 U.S. 731, 753-54

always choose to exercise this power, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384 (1879); *see also Foster v. Love*, 522 U.S. 67, 69 (1997) (stating that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices" (citation omitted)). Moreover, we have held that the Elections Clause requires states to implement Congress's superseding regulations without compensation from the federal government. *See Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Thus, unlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to "conscript state agencies to carry out" federal mandates. *Id.* In sum, a state's role in the creation and implementation of federal election procedures under the Elections Clause is to administer the elections through its own procedures until Congress deems otherwise; if and when Congress does so, the states are obligated to conform to and carry out whatever procedures Congress requires. *See Foster*, 522 U.S. at 69.

As should be clear from this overview, the Elections Clause operates quite differently from the Supremacy Clause. The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under our system of dual sovereignty, courts deciding whether a particular state law is preempted under the Supremacy Clause must strive to main-

---

(1888) (authority to regulate conduct at any election coinciding with federal contest); *Ex parte Yarbrough* (*The Ku-Klux Cases*), 110 U.S. 651, 662 (1884) (authority to make additional laws for free, pure, and safe exercise of right to vote); *Ex parte Clarke*, 100 U.S. 399, 404 (1879) (authority to punish state election officers for violation of state duties vis-a-vis congressional elections).

tain the "delicate balance" between the States and the Federal Government, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see Medtronic*, 518 U.S. at 485, especially when Congress is regulating in an area "traditionally occupied by the States," *United States v. Locke*, 529 U.S. 89, 108 (2000) (internal quotation marks omitted); *see also Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992). The Supreme Court has crafted special guidelines to assist courts in striking this balance. First, courts applying the Supremacy Clause are to begin with a presumption against preemption. *E.g.*, *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008); *Medtronic*, 518 U.S. at 485. This principle applies because, as the Court has recently noted, "respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action." *Wyeth v. Levine*, 129 S. Ct. 1187, 1195 n.3 (2009) (internal quotation marks omitted). Second, the Court has adopted a "plain statement rule," holding that a federal statute preempts a state law only when it is the "clear and manifest" purpose of Congress to do so. *Gregory*, 501 U.S. at 461 (internal quotation marks omitted). Only where the state and federal laws cannot be reconciled do courts hold that Congress's enactments must prevail. *See, e.g.*, *Altria*, 555 U.S. at 76-77.

[3] In contrast to the Supremacy Clause, which addresses preemption in areas within the states' historic police powers, the Elections Clause affects only an area in which the states have no inherent or reserved power: the regulation of federal elections. *See U.S. Term Limits*, 514 U.S. at 804-05. As the Supreme Court has explained, because federal elections did not exist prior to the formation of the federal government, the states' sole authority to regulate such elections "aris[es] from the Constitution itself," *id.* at 805. Because states have no reserved authority over the domain of federal elections, courts deciding issues raised under the Elections Clause need not be concerned with preserving a "delicate balance" between competing sovereigns. Instead, the Elections Clause, as a standalone preemption provision, establishes its own balance. For

this reason, the "presumption against preemption" and "plain statement rule" that guide Supremacy Clause analysis are not transferable to the Elections Clause context. *See Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008) (declining to apply Supremacy Clause preemption principles in analyzing the preemptive effect of the NVRA). Indeed, the Supreme Court has suggested as much. In *Foster,* the Supreme Court upheld the Fifth Circuit's determination that a state election law was voided by a federal election law; however, instead of adopting the Fifth Circuit's Supremacy Clause analysis, the Court analyzed the claim under the Elections Clause, without ever mentioning a presumption against preemption or plain statement rule. *See Foster*, 522 U.S. 67, *aff'g* 90 F.3d 1026 (5th Cir. 1996). In fact, our survey of Supreme Court opinions deciding issues under the Elections Clause reveals no case where the Court relied on or even discussed Supremacy Clause principles. Because the Elections Clause empowered Congress to enact the NVRA, *see Wilson*, 60 F.3d at 1413-14, the preemption analysis under that Clause applies here.

B

The Supreme Court first explained the principles of Elections Clause preemption in *Siebold*, 100 U.S. 371. In that case, the Court likened the relationship between laws passed by state legislatures and those enacted by Congress under the Elections Clause to "prior and subsequent enactments of the same legislature." *Id.* at 384. "The State laws which Congress sees no occasion to alter, but which it allows to stand, are in effect adopted by Congress." *Id.* at 388. Just as a subsequent legislature is not required to make an "entirely new set" of laws when modifying those of a prior legislature, neither is Congress required to wholly take over the regulation of federal election procedures when choosing to "make or alter" certain of the states' rules. *Id.* at 384. There is no "intrinsic difficulty in such co-operation" between the state and national legislatures because the two governments do not possess an "equality of jurisdiction" with respect to federal elections. *Id.*

at 392. In all instances, "the laws of the State, in so far as they are inconsistent with the laws of Congress on the same subject, cease to have effect as laws." *Id.* at 397.

Over a century later, the Supreme Court clarified what constitutes a conflict under an Elections Clause analysis. *See Foster*, 522 U.S. 67. *Foster* considered whether a congressional enactment superseded a Louisiana statute regulating the same federal election procedure. *Id.* at 68-69. Specifically, federal law set the date for congressional elections as the Tuesday after the first Monday in November. *Id.* at 68. A Louisiana statute established an open primary in October for the offices of United States Senator and Representative. *Id.* at 70. Only if the open primary failed to result in a majority candidate would a run off election between the top two candidates be held on Congress's specified election day. *Id.* In response to a challenge by Louisiana voters, the Court unanimously held that the state and federal acts conflicted and thus that the federal statute superseded the Louisiana law. *Id.* at 74.

The Court rejected the state's claim that its statute and the federal enactment could be construed harmoniously. *Id.* at 72-73. Louisiana asserted that "the open primary system concern[ed] only the 'manner' of electing federal officials, not the 'time' at which the elections will take place." *Id.* at 72. The Court discarded the state's "attempt to draw this time-manner line" as "merely wordplay" and an "imaginative characterization" of the statutes. *Id.* at 72-73. Building upon the principles from *Siebold*, the Court declined to adopt a strained interpretation of the statutes to reconcile a potential disagreement.[9] *See id.* Rather, the Court emphasized Congress's ple-

---

[9]The dissent's claim that in *Foster* there was a "blatant conflict" between the state and federal election laws, dis. op. at 4213, is incorrect. Rather, the petitioners in *Foster* proffered a reading of the state and federal statutes that at least technically avoided a conflict. *See Foster*, 522 U.S. at 72 (arguing that "because Louisiana law provides for a 'general election' on federal election day in those unusual instances when one is

nary authority not only to supplant state rules but to conscript states to carry out federal enactments under the Elections Clause, and found it enough that, under a natural reading, the state and federal enactments addressed the same procedures and were in conflict. *Id.* Refusing to pare the statute "down to the definitional bone," the Court held that the state enactment was void. *Id.* at 72, 74.

Reading *Siebold* and *Foster* together, we derive the following approach for determining whether federal enactments under the Elections Clause displace a state's procedures for conducting federal elections. First, as suggested in *Siebold*, we consider the state and federal laws as if they comprise a single system of federal election procedures. *Siebold*, 100 U.S. at 384. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. *See id.* If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. *Foster*, 522 U.S. at 74; *see id.* at 72-73. If the two statutes do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to "alter" the state's regulation, and that regulation is superseded.

C

Before applying this Elections Clause analysis here, we must understand the scope and application of the federal and

---

needed, the open primary system concerns only the 'manner' of electing federal officials, not the 'time' at which the elections will take place"). The Court rejected this reading as "merely wordplay." *Id.* The dissent provides a similarly strained reading of the NVRA and Proposition 200, *see* dis. op. at 4203-04, 4206-07 which likewise falls short, *see infra* at 4138-43.

state statutes at issue, namely the NVRA and Proposition 200's registration provision.

The NVRA prescribes three methods for registering voters for federal elections. 42 U.S.C. § 1973gg-2(a). These methods are: (1) "by application made simultaneously with an application for a motor vehicle driver's license," *id.* § 1973gg-2(a)(1);[10] (2) "by mail application" using the Federal Form prescribed by the Election Assistance Commission (EAC),[11] *id.* §§ 1973gg-2(a)(2), 1973gg-4; and (3) "by application in person" at sites designated in accordance with state law or state voter registration agencies, *id.* § 1973gg-2(a)(3). States must "establish procedures to register" voters through all three methods "notwithstanding any other Federal or State law" and "in addition to any other method of voter registration provided for under State law." *Id.* § 1973gg-2(a).[12]

In connection with prescribing these three methods of voter registration, the NVRA mandates the creation of two new voter registration applications. First, the NVRA requires states to create a combined driver's license and voter registration application form (the "Motor Voter Form") pursuant to certain criteria set out in the statute. *See id.* § 1973gg-3. The

---

[10]Under this method, any application for a driver's license submitted to a state motor vehicle authority "shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application." § 1973gg-3(a)(1). This provision earned the statute its informal name: the "Motor Voter Law."

[11]The responsibilities of the EAC were formerly held by the Federal Election Commission (FEC). When Congress passed the Help America Vote Act or 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666, it created the EAC, 42 U.S.C. § 15321, which eventually absorbed the FEC's duties under the NVRA, *see* 42 U.S.C. § 15532. In this opinion, we refer to both entities as the EAC.

[12]States that do not require registration to vote or allow election-day registration at polling places are exempt from the NVRA. *See* § 1973gg-2(b). These states are Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming. *See* 75 Fed. Reg. 47,729-01, 47,730 (Aug. 9, 2010).

NVRA also requires the EAC to create the Federal Form, a nationally uniform voter application that applicants can use to register by mail and in person at designated locations. *See id.* §§ 1973gg-4, 1973gg-7(a)(2). In addition, states may (but are not required to) create their own state mail voter registration forms for federal elections (the "State Form"), so long as these forms meet certain criteria in the NVRA. *See id.* § 1973gg-4(a)(2).

The NVRA sets out a broad framework for the contents of the Federal Form, including specifying certain items that must be included on the form, along with other items that cannot be. *See id.* § 1973gg-7(b). Among other things, *id.* § 1973gg-7(b) provides that the Federal Form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 1973gg-7(b)(1). Further, the Federal Form must include a statement specifying "each eligibility requirement (including citizenship)" for voting along with an "attestation that the applicant meets each such requirement," *id.* § 1973gg-7(b)(2)(A)-(B), and must require "the signature of the applicant, under penalty of perjury," *id.* § 1973gg-7(b)(2)(C). In addition, the NVRA provides that the Federal Form *cannot* include "any requirement for notarization or other formal authentication," *id.* § 1973gg-7(b)(3).[13]

---

[13]In full, section 1973-gg7(b) states that the Federal Form

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that—

(A) specifies each eligibility requirement (including citizenship);

The NVRA directs the EAC, in consultation with "the chief election officers of the States," to develop the Federal Form in a manner consistent with these broad guidelines. *Id.* § 1973gg-7(a)(2). The EAC discharged this statutory requirement by designing a Federal Form that met the criteria set forth in section 1973gg-7(b). *See* 59 Fed. Reg. 32,311-01 (June 23, 1994), codified at 11 C.F.R., pt. 9428. As designed by the EAC (and subsequently modified by HAVA, 42 U.S.C. §§ 15301 *et seq.*), the Federal Form is a postcard.[14] *See* 11 C.F.R. § 9428.5. The top of the form asks "Are you a citizen of the United States of America?" and "Will you be 18 years old on or before election day?" with boxes for the applicant to check yes or no.[15] Applicants who check "no" to either of these questions are instructed not to complete the form. If the

---

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application—

(i) the voter eligibility requirements and penalties for false applications set forth in § 1973gg-6(a)(5);

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

*Id.* § 1973gg-7(b).

[14]The Federal Form is set forth in Appendix A.

[15]These two questions and the associated instructions were added to the Federal Form by HAVA. 42 U.S.C. § 15483(b)(4)(A)(i)-(ii).

applicant checks "yes" to both questions, the form then requests the applicant's name, address, date of birth, telephone number (optional), choice of party,[16] race or ethnic group,[17] and "ID number."[18] It also requires the applicant to attest (with a signature or mark) that he or she is a U.S. citizen, meets his or her state's voting eligibility requirements, and has provided information that is "true to the best of [his or her] knowledge under penalty of perjury." No other proof of U.S. citizenship is required. The Federal Form postcard may be dropped into the mail or delivered in person to one of the designated offices.

As noted above, in addition to mandating the creation and use of the Federal Form, the NVRA allows states to develop and use an optional State Form for registering voters for federal elections. *See* 42 U.S.C. § 1973gg-4(a)(2). If a state chooses to create a State Form, that form must conform to the broad framework for the contents of the Federal Form set forth in section 1973gg-7(b). *See id.* Arizona chose to create a State Form[19] that is similar to the Federal Form but requires that first-time voters and persons who have moved between Arizona counties "also include proof of citizenship or the

---

[16]"Choice of party" is required in some states for voters who wish to participate in closed primaries. It is not required to register to vote in general elections. *See* 59 Fed. Reg. at 32,314.

[17]This box was included on the Federal Form to assist certain states in their data collection efforts pursuant to § 5 of the VRA. *Id.* at 32,315-16.

[18]The "ID number" is used for "election administration purposes." 11 C.F.R. § 9428.4(a)(6), *see* 59 Fed. Reg. at 32,314 (explaining that ID numbers "are not necessary for determining the eligibility of the applicant," but rather are for assisting the states in administering the registration process). The Federal Form's instruction booklet provides state-specific instructions for the "ID number" box: for Arizona, applicants must provide a driver's license, non-operating identification license number, the last four digits of a social security number, or write "None." These instructions are consistent with Arizona's election administration obligations under HAVA. *See infra* at pp. 4144-45.

[19]The Arizona State Form is set forth in Appendix B.

form will be rejected." According to the State Form instructions, an applicant can satisfy this proof of citizenship requirement by writing in a designated box on the State Form the number of the applicant's Arizona driver's license or nonoperating identification license issued after October 1, 1996,[20] alien registration number, or specified tribal identification number (as relevant). If the applicant lacks such a number, the applicant must include a photocopy of one of the acceptable documents listed on the State Form (such as a birth certificate, U.S. passport, tribal document, or the like) along with the form itself.

**[4]** While the NVRA permits states to use their own State Forms to register voters for federal elections, the NVRA still requires every state to "accept and use" the Federal Form developed by the EAC. *See id.* § 1973gg-4(a)(2) ("*In addition to* accepting and using [the Federal Form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title for the registration of voters in elections for Federal office." (emphasis added)). In this way, the NVRA guarantees that an applicant in any state seeking to register to vote in federal elections may do so using the Federal Form.

D

Having reviewed the relevant provisions of the NVRA, we now turn to Proposition 200's registration provision, which states: "The county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz. Rev. Stat. § 16-166(F). The statute defines satisfactory evidence of U.S. citizenship to include the number of the applicant's driver's license or nonoperating identification license, certain numbers associated

---

[20]Arizona started requiring applicants to provide documentation of their lawful status as U.S. residents as a condition of receiving a driver's license or non-operating identification license after October 1, 1996.

with Native American tribal status, the number of a certificate of naturalization (or the in-person presentation of naturalization documents), or a legible photocopy of a U.S. birth certificate or passport.[21] *See id.*

By its terms, this proof of citizenship requirement applies to the Federal Form as well as to Arizona's State Form.[22] In

---

[21]Section 16-166(F) provides the following list of approved identification documents:

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

[22]Proposition 200 also amended state law to require Arizona's State Form to "contain . . . [a] statement that the applicant shall submit evidence of United States citizenship with the application and that the registrar shall reject the application if no evidence of citizenship is attached." Ariz. Rev. Stat. § 16-152(A)(23). Because this provision does not affect the Federal Form, we do not consider it here.

other words, Proposition 200's registration provision directs
Arizona county recorders to reject every Federal Form that is
submitted without the specified evidence of citizenship.
According to the Arizona Election Procedures Manual, which
has the force and effect of law, *see* Ariz. Rev. Stat. § 16-452,
if a rejected applicant wants to make a second attempt to pro-
vide evidence of citizenship, he or she must submit an entirely
new voter registration form in order to do so.[23]

E

We now turn to Gonzalez and ITCA's contention that the
NVRA's requirement that states "accept and use" the Federal
Form supersedes Proposition 200's registration provision as
applied to applicants using the Federal Form.[24]

**[5]** In assessing this argument, we apply the Elections
Clause framework we derived from *Siebold* and *Foster* and
consider the NVRA and Proposition 200's registration provi-
sion as if they comprise a single system of federal election
procedures. With respect to mail voter registration, the NVRA
provides that "[e]ach State shall accept and use" the Federal
Form "for the registration of voters in elections for Federal
office." 42 U.S.C. § 1973gg-4(a)(1). By contrast, Proposition
200's registration provision directs county recorders to "reject
any application for registration that is not accompanied by
satisfactory evidence of United States citizenship," as defined

---

[23]The manual instructs county recorders:

> If [a voter registration] form is not accompanied by proper proof
> of citizenship, the voter registration form is not valid and either
> will not be entered into the system or if it was entered into the
> system, the record shall be canceled. If the registrant subse-
> quently provides proof of citizenship, it must be accompanied by
> a new voter registration form and a new registration date.

Arizona Secretary of State Elections Procedures Manual (Oct. 2007).

[24]Gonzalez and ITCA do not challenge Proposition 200's registration
provision as applied to Arizona's State Form.

by Arizona law. Ariz. Rev. Stat. § 16-166(F). When read together, the federal and state enactments treat the same subject matter, namely, the procedure for registering by mail to vote in federal elections using the Federal Form, but they do not operate harmoniously. In fact, these procedures are seriously out of tune with each other in several ways.

First, the NVRA requires a county recorder to accept and use the Federal Form to register voters for federal elections, whereas the registration provision requires the same county recorder to reject the Federal Form as insufficient for voter registration if the form does not include proof of U.S. citizenship. Arizona attempts to harmonize these procedures, arguing that because the county recorder will accept the Federal Form for voter registration so long as it includes satisfactory evidence of citizenship, the county recorder is in fact complying with the NVRA's mandate to "accept and use" the Federal Form, per 42 U.S.C. § 1973gg-4(a)(1). Rejection of the Federal Form in certain circumstances, Arizona argues, does not in itself mean that the state is failing to accept and use the form. Indeed, Arizona asserts, Congress must have contemplated that some applicants using the Federal Form would be rejected, because the NVRA directs states to notify "each applicant of the disposition of [his or her] application." *Id.* § 1973gg-6(a)(2).

**[6]** We disagree. Although Arizona has offered a creative interpretation of the state and federal statutes in an effort to avoid a direct conflict, we do not strain to reconcile a state's federal election regulations with those of Congress, but consider whether the state and federal procedures operate harmoniously when read together naturally. *See Foster*, 522 U.S. at 72-74; *Siebold*, 100 U.S. at 384. Here, under a natural reading of the NVRA, Arizona's rejection of every Federal Form submitted without proof of citizenship does not constitute "accepting and using" the Federal Form. Arizona cannot cast doubt on this conclusion by pointing out that the NVRA allows states to reject applicants who fail to demonstrate their

eligibility pursuant to the Federal Form. Congress clearly anticipated that states would reject applicants whose responses to the Federal Form indicate they are too young to vote, do not live within the state, or have not attested to being U.S. citizens. Indeed, the NVRA instructs the EAC to request information on the Federal Form for the precise purpose of "enabl[ing] the appropriate State election official to assess the eligibility of the applicant." 42 U.S.C. § 1973gg-7(b)(1). Thus, a state that assesses an applicant's eligibility based on the information requested on the Federal Form is "accepting and using" the form in exactly the way it was meant to be used. In contrast, Proposition 200's registration provision directs county recorders to assess an applicant's eligibility based on proof of citizenship information that is *not* requested on the Federal Form, and to reject all Federal Forms that are submitted without such proof. Rejecting the Federal Form because the applicant failed to include information that is not required by that form is contrary to the form's intended use and purpose.

The dissent likewise attempts to justify Arizona's rejection of the Federal Form, but rests its arguments almost exclusively on the fact that § 1973gg-4(a)(2) allows states to develop and use a State Form, which may include requirements that are not included in the Federal Form. *See* dis. op at 4200-03, 4204-06. According to the dissent, because states may impose additional proof-of-citizenship requirements on applicants using the State Form, it necessarily follows that states may impose the same proof-of-citizenship requirements on applicants using the Federal Form; that is, that they may reject Federal Forms that do not include the additional proof of citizenship. *See* dis. op. at 4203-06. But there is no logical connection between the dissent's premise and its conclusion, which is contrary to the text of the statute. The NVRA clearly requires states to accept and use the Federal Form (as designed by the EAC) "[i]n addition to" the State Form.

The NVRA's State Form provision, § 1973gg-4(a)(2), merely gives a state more options. Congress could have required all states to use *only* the Federal Form, as designed by the EAC, for federal elections. If Congress had done so, then states could not use their state registration forms to register applicants for federal elections. Instead, Congress allowed States to use their state registration forms to register applicants for both state and federal elections (provided the state form complies with § 1973gg-7(b)).[25] But states cannot reject applicants who register for federal elections who use the Federal Form. There is nothing illogical or inconsistent about requiring states to accept the federal registration form in addition to their own state form.

In order to avoid the clear import of the NVRA's text, the dissent argues that the Federal Form merely establishes the default minimum or baseline registration requirements. *See* dis. op. at 4203-04, 4209. In effect, the dissent wants to replace the words "in addition to" with the words "instead of," so that "a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title" *instead of* "accepting and using" the Federal Form. We have no authority to rewrite the statute, however, and reject the dissent's interpretation as being inconsistent with the plain language. *See id.* ("*In addition to* accepting and using [the Federal Form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title for the registration of voters in elections for Federal office." (emphasis added)).

---

[25]The dissent therefore has it exactly backwards in asserting that, under our interpretation of § 1973gg-4(a)(2), states may not use their state registration forms to register "voters in elections for Federal office." Dis. op. at 4208. States *may* use their state registration forms to register voters in elections for federal office; they simply may not *require* registrants to use the State Form (or the equivalent of the State Form, namely, the Federal Form altered to include additional state requirements).

**[7]** Second, Proposition 200's registration provision clashes with the NVRA's delegation of authority to the EAC (not the states) to determine the contents of the Federal Form. *See id.* § 1973gg-7(a)(2). While states may suggest changes to the Federal Form, the EAC has the ultimate authority to adopt or reject those suggestions. *See id.* § 1973gg-7(a). Here the EAC sent Arizona a letter rejecting its proposal to modify the Federal Form to require applicants to present documentary proof of citizenship in order to register, *see infra* p. 4148 n.29, but Arizona nevertheless proceeded to impose this additional requirement on applicants using the Federal Form. Arizona's insistence on engrafting an additional requirement on the Federal Form, even in the face of the EAC's rejection of its proposal, accentuates the conflict between the state and federal procedures.[26]

Arizona attempts to minimize the clash between the NVRA and Proposition 200 by noting that a proof of citizenship requirement is consistent with the broad framework set out by Congress in section 1973gg-7(b); specifically, Arizona notes that the NVRA permits the Federal Form to seek such information as is necessary to "assess the eligibility of the applicant," *id.* § 1973gg-7(b)(1), and does not expressly preclude a requirement that applicants provide proof of citizenship. Further, Arizona asserts that although Congress provided that

---

[26]Arizona argues that *McKay v. Thompson*, 226 F.3d 752, 755-56 (6th Cir. 2000), supports its conclusion that states may add requirements to the Federal Form, so long as the NVRA does not expressly forbid those requirements. Arizona is misreading McKay. In that case, the court rejected a prospective voter's objection to Tennessee's practice of requiring a full social security number as a precondition to successful registration, *see id.* at 754, stating that "[t]he NVRA does not specifically forbid use of social security numbers." *Id.* at 756. But this holding does not help Arizona because the Federal Form allows states to instruct applicants to provide their full social security numbers in the "ID number" box on the Federal Form (and Tennessee's instructions do so). *See supra* p. 4135 & n.18. *McKay* therefore does not support the proposition that a state may condition registration on an applicant's provision of information that is *not* requested on the Federal Form.

the mail voter registration form "may not include any requirement for notarization or other formal authentication," *id.* § 1973gg-7(b)(3), Arizona's demand for proof of citizenship does not amount to such a requirement. This argument misses the point. Even assuming, without deciding, that Arizona is correct in its interpretation of section 1973gg-7(b), this would mean only that the NVRA allows Arizona to include a proof of citizenship requirement on its State Form. *See id.* § 1973gg-4(a)(2) (allowing a state to "develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b)"). It would not mean that Arizona has authority to add this requirement to the Federal Form. Congress entrusted that decision to the EAC. Once the EAC determined the contents of the Federal Form, Arizona's only role was to make that form available to applicants and to "accept and use" it for the registration of voters.

**[8]** Third, Proposition 200's registration provision is discordant with the NVRA's goal of streamlining the registration process. *See, e.g.*, *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 285 (4th Cir. 1998) ("Congress passed the NVRA . . . to make it easier to register to vote . . . ."); *ACORN v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997) ("In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the [NVRA]."). While the EAC chose to design the Federal Form as a postcard, which could be easily filled out and mailed on its own, Proposition 200's registration provision makes the Federal Form much more difficult to use. For example, nothing on the face of the Federal Form or in the state-specific instructions for Arizona indicates that some applicants may need to provide a full social security number, a tribal identification number, or an alien registration number, as Proposition 200 requires.[27] Nor does the Federal Form instruct that additional

---

[27]Because the Federal Form can be used as a mail-in postcard, the dissent's credit card analogy, *see* dis. op. at 4204, is not on point. A con-

documents, such as birth certificates or passports, must be provided by some applicants. Even if an applicant were aware of Arizona's requirement to provide documentary proof of citizenship with the Federal Form, the applicant would have to locate the required document, photocopy it, and enclose the photocopy with the form in an envelope for mailing. In short, much of the value of the Federal Form in removing obstacles to the voter registration process is lost under Proposition 200's registration provision.

Notwithstanding these concerns, Arizona asserts that Proposition 200's registration provision imposes little additional burden on applicants, because only a small minority of applicants lack a driver's license number, tribal identification number, or alien registration number, all of which could suffice to show citizenship and can easily be written on the Federal Form. For this reason, Arizona contends, its proof of citizenship requirement is not excessively burdensome under the standard set forth in *Crawford v. Marion County Election Board*, 553 U.S. 181, 199-200 (2008) (Stevens, J., announcing the judgment of the Court). This argument misses the mark. The goal of the NVRA was to streamline the registration process for all applicants; the fact that Proposition 200's registration provision only *partially* undermines this goal does not make it harmonious with the NVRA. Nor does *Crawford* provide support for Arizona's argument. In *Crawford*, the Court considered whether a polling place requirement imposed a substantial burden on the right to vote, in violation of the Fourteenth Amendment. *See id.* at 187. Even if Arizona is correct that Proposition 200's registration provision does

sumer would rightly cry foul if a merchant claimed it would "accept and use" mailed-in credit card information for a purchase, but then refused to complete the transaction because the consumer failed to include additional information that the merchant had not requested. By the same token, the Federal Form does not request documentary proof of citizenship. Because a state must "accept and use" this form it cannot reject it merely because an applicant has mailed it in without including information that is not expressly required.

not impose such a burden, this conclusion sheds no light on the question before us here: whether the registration provision is displaced by the NVRA under an Elections Clause analysis.

F

Because on its face the NVRA does not give states room to add their own requirements to the Federal Form, Arizona suggests that Congress's subsequent enactment of HAVA permits us to reinterpret the NVRA to allow states to impose additional requirements on applicants for voter registration. Again, we disagree, because by its terms HAVA precludes such an interpretation.

Congress enacted HAVA in response to the 2000 Presidential election and the ensuing controversial Florida recount. *See Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1155 (11th Cir. 2008). For the most part, the NVRA and HAVA operate in separate spheres: the NVRA regulates voter registration, whereas HAVA is concerned with updating election technologies and other election-day issues at polling places. However, a handful of provisions in HAVA relate to the voter registration process, primarily by creating mechanisms through which states can ensure that the person who appears to cast a ballot at the polls is the same person who registered to vote. Relevant here, HAVA requires states to obtain (or assign) unique identification numbers for all registered voters: each applicant must provide his or her driver's license number or the last four digits of his or her social security number on the voter registration form, or if the applicant lacks such a number, the state must assign the applicant a number "which will serve to identify the applicant for voter registration purposes." 42 U.S.C. § 15483(a)(5)(A)(i)-(ii). In addition, states are to take steps to verify that the applicant's claimed identity matches the identification number he or she provided. *See id.* § 15483(a)(5)(A)(iii) (requiring states to "determine whether the [identification] information provided

by an individual is sufficient to meet the requirements" of HAVA); *see also Crawford,* 553 U.S. at 192.

HAVA also includes language limiting its scope. It clarifies that "[t]he requirements established by [HAVA] are minimum requirements and nothing in [HAVA] shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under [HAVA] so long as such State requirements are not inconsistent with the Federal requirements under [HAVA] or any law described in section 15545 of this title." *Id.* § 15484. Section 15545 is HAVA's savings clause: it provides that except for the changes to the NVRA specified in HAVA, "nothing in this Act may be construed to authorize or require conduct prohibited under [a number of federal laws, including the NVRA], or to supersede, restrict, or limit the application of [those federal laws]." *Id.* § 15545(a).

Arizona argues that HAVA gives it the authority to impose additional requirements on applicants using the Federal Form for two reasons. First, Arizona contends that because HAVA directs states to verify the accuracy of the driver's license or social security numbers provided on the Federal Form, *see id.* § 15483(a)(5)(A)(iii), Arizona must likewise have the authority to verify the accuracy of other information on the Federal Form, including an applicant's claim of citizenship. Second, Arizona asserts that because HAVA establishes only "minimum requirements," and authorizes states to develop "election technology and administration requirements that are more strict than [HAVA's] requirements," *id.* § 15484, HAVA gives states a green light to impose stricter requirements on voter registration.

Both of these arguments fail in light of HAVA's savings clause, which makes clear that Congress intended to preserve the NVRA except as to the specific changes it enacted in HAVA. While HAVA made a handful of changes to the

NVRA, it did not add a proof of citizenship requirement to the Federal Form and did not authorize states to do so. For the reasons explained above, an interpretation of HAVA that allows states to override the EAC's authority in designing the Federal Form would "supersede, restrict, or limit the application of" the NVRA. *Id.* § 15545(a). Because the savings clause precludes such an interpretation, we decline to adopt one. Therefore, HAVA does not provide Arizona the authorization it seeks.

G

We recognize Arizona's concern about fraudulent voter registration. Nevertheless, the Elections Clause gives Congress the last word on how this concern will be addressed in the context of federal elections. As is evidenced by one of the four articulated purposes of the NVRA, which is "to protect the integrity of the electoral process," *id.* § 1973gg(b)(3), Congress was well aware of the problem of voter fraud when it passed the act and provided for numerous fraud protections in the NVRA.[28]

With respect to the Federal Form, Congress delegated to the EAC the decision of how to balance the need "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and the

---

[28]These safeguards include the NVRA's requirement that the Federal Form, the State Forms, and the Motor Voter Forms contain an attestation clause that sets out the requirements for voter eligibility. *Id.* §§ 1973gg-3(c)(2)(C)(i)-(ii), 1973gg- 7(b)(2)(A)-(B). Applicants are required to sign these forms under penalty of perjury, *id.* §§ 1973gg-3(c)(2)(C)(iii), 1973gg-7(b)(2)(C), and persons who knowingly and willfully engage in fraudulent registration practices are subject to criminal penalties, *id.* § 1973gg-10(2). In addition, the NVRA allows states to require first-time voters who register by mail to vote in person at the polling place, where the voter's identity can be confirmed. *See id.* § 1973gg-4(c). Finally, section 1973gg-6 requires states to give notice to applicants of the disposition of their applications, which states may use as a means to detect fraudulent registrations. *See id.* § 1973gg-6(a)(2).

need to protect "the integrity of the electoral process," *id.* § 1973gg(b)(1), (3). The EAC struck this balance by requiring applicants to attest to their citizenship under penalty of perjury, but not requiring other proof of citizenship. *See* 59 Fed. Reg. at 32,316 ("The issue of U.S. citizenship is addressed within the oath required by the Act and signed by the applicant under penalty of perjury. To further emphasize this prerequisite to the applicant, the words 'For U.S. Citizens Only' will appear in prominent type on the front cover of the national mail voter registration form."). Though Arizona has eloquently expressed its reasons for striking the balance differently, the federal determination controls in this context. *See ACORN v. Edgar*, 56 F.3d 791, 795-96 (7th Cir. 1995) (rejecting Illinois's argument that because the "motor voter" component of the NVRA "opens the door to voter fraud," the state was entitled to refuse to comply with the law).

**[9]** In sum, the NVRA and Proposition 200's registration provision, when interpreted naturally, do not operate harmoniously as a single procedural scheme for the registration of voters for federal elections. Therefore, under Congress's expansive Elections Clause power, we must hold that the registration provision, when applied to the Federal Form, is preempted by the NVRA.[29]

---

[29]We reach our conclusion based on the language and structure of the statute, and therefore do not rely on the EAC's interpretation of the NVRA or the NVRA's legislative history. While ITCA maintains that the EAC's view is entitled to some level of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), Arizona argues that Congress did not delegate any authority to the EAC to interpret the NVRA, *see* 42 U.S.C. § 15329, and thus deference is not appropriate. We need not resolve this dispute, but merely note that both the EAC's view and the NVRA's legislative history are consistent with our holding. In its letter to Arizona, the EAC construed the NVRA as not permitting states to "condition acceptance of the Federal Form upon receipt of additional proof." With respect to the legislative history, the NVRA's Conference Report, which we have held is the most authoritative and reliable legislative material, *see, e.g., Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 835 (9th Cir. 1996), shows that Con-

III

Because we hold that the NVRA supersedes Proposition 200's registration provision,[30] the remainder of our analysis focuses solely on the validity of Proposition 200's polling place provision. Proposition 200 amended section 16-579 of the Arizona Revised Statutes to require that a voter "present one form of identification that bears the name, address and photograph of the elector or two different forms of identification that bear the name and address of the elector" as a prerequisite to receiving a ballot. Ariz. Rev. Stat. § 16-579(A) (2005). The Secretary of State, acting under statutory authority, *see* Ariz. Rev. Stat. § 16-452(A), (B), promulgated a procedure specifying the "forms of identification" accepted under the statute, which included photograph-bearing documents such as driver's licenses as well as non-photograph-bearing documents such as utility bills or bank statements. In 2009, the state legislature amended section 16-579 to codify that procedure.[31]

---

gress rejected an amendment to the NVRA which would have provided that "nothing in this Act shall prevent a State from requiring presentation of documentation relating to citizenship of an applicant for voter registration," H.R. Rep. No. 103-66, at 23 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140, 148. The conferees explained that the amendment was not "consistent with the purposes of" the NVRA and "could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.*

[30]Congress's authority under the Elections Clause is limited to preempting state regulations as they relate to federal elections. Therefore, our holding invalidating Proposition 200's registration provision does not prevent Arizona from applying a proof of citizenship requirement to voter registrations for state elections. However, because Arizona has presented its system of voter registration as concurrently registering voters for state and federal elections, we do not consider whether Proposition 200's registration provision, as applied only to voter registrations for state elections, is valid under Gonzalez and ITCA's remaining claims.

[31]Section 16-579(A)(1) now provides that a voter must "present any of the following" before being permitted to vote:

Gonzalez and ITCA challenge Proposition 200's polling place provision on three grounds: that it is a prohibited voting qualification under section 2 of the VRA, an unconstitutional poll tax under the Twenty-fourth Amendment, and a violation of the Fourteenth Amendment's Equal Protection Clause. We first consider Gonzalez's argument that Proposition 200's polling place provision violates section 2 of the VRA.

---

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is labeled as "official election material." Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States Military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

A

**[10]** Section 2(a) of the VRA prohibits states from imposing any voting qualification that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of section 2 is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class, "in that its members have less opportunity than other members of the electorate [1] to participate in the political process and [2] to elect representatives of their choice." *Id.* § 1973(b). Said otherwise, a plaintiff can prevail in a section 2 claim only if, "based on the totality of the circumstances, . . . the challenged voting practice results in discrimination on account of race." *Farrakhan v. Washington*, 338 F.3d 1009, 1017 (9th Cir. 2003) (emphasis omitted); *see also United States v. Blaine Cnty.*, 363 F.3d 897, 903 (9th Cir. 2004). Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, *see Chisom v. Roemer*, 501 U.S. 380, 383-84 (1991); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557 (9th Cir. 1998) (per curiam), proof of "causal connection between the challenged voting practice and a prohibited discriminatory result" is crucial, *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (internal quotation marks and brackets omitted); *see also id.* ("[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry."). Said otherwise, a § 2 challenge "based purely on a showing of some relevant statistical disparity between minorities and whites," without any evidence that the challenged voting qualification causes that disparity, will be rejected. *Id.*[32]

---

[32]This approach applies both to claims of vote denial and of vote dilution. *Id.* at 596 n.8.

In applying the totality of the circumstances test, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.' " *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (quoting S. Rep. No. 97-417, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205). In *Gingles*, the Supreme Court cited a non-exhaustive list of nine factors (generally referred to as the "Senate Factors" because they were discussed in the Senate Report on the 1982 amendments to the VRA) that courts should consider in making this totality of the circumstances assessment. *Id.* at 44-45. Relevant here, the factors direct courts to consider the history of official state discrimination against the minority with respect to voting, the extent to which voting in the state is racially polarized, and "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* at 36-37 (quoting S. Rep. No. 97-417, at 28-29, *reprinted in* 1982 U.S.C.C.A.N. at 206-07); *see Farrakhan*, 338 F.3d at 1016, 1020. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29, *reprinted in* 1982 U.S.C.C.A.N. at 209) (internal quotation marks omitted).

Gonzalez argues that Proposition 200 disparately impacts Latino voters, unlawfully diluting their right to vote and denying them the right to vote by providing them with less opportunity than other members of the electorate to participate in the political process. Considering both Proposition 200's registration requirement and its requirement that voters who cast ballots at the polls present specified identification, the district court determined, after "examining the facts as a whole, [that] Proposition 200 does not have a statistically significant disparate impact on Latino voters."[33] In considering the Senate Fac-

---

[33]Judge Pregerson's dissent relies heavily on statistical analysis pre-

tors listed above, the district court found that Latinos had suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting. Nevertheless, the district court concluded that Gonzalez's claim failed because there was no proof of a causal relationship between Proposition 200 and any alleged discriminatory impact on Latinos. The district court noted that not a single expert testified to a causal connection between Proposition 200's requirements and the observed difference in the voting rates of Latinos, and that Gonzalez had failed to explain how Proposition 200's requirements interact with the social and historical climate of discrimination to impact Latino voting in Arizona. Therefore, the district court concluded that Gonzalez had not proved that Proposition 200 results in discrimination "on account of race or color."

Because a § 2 analysis requires the district court to engage in a "searching practical evaluation of the 'past and present reality,' " *Gingles*, 478 U.S. at 45 (quoting S. Rep. 97-417, at 30, *reprinted in* 1982 U.S.C.C.A.N. at 208), a district court's examination in such a case is "intensely fact-based and localized," *Salt River*, 109 F.3d at 591. We therefore "[d]efer[ ] to the district court's superior fact-finding capabilities," *id.*, and review for clear error the district court's findings of fact, including its ultimate finding whether, under the totality of the circumstances, the challenged practice violates § 2, *Old Per-*

---

pared by the plaintiffs' expert, Dr. Louis Lanier. Dis. op. at 4197-98. The state's expert, however, testified that Lanier's results were unreliable in light of several factors, including the absence of evidence that the Latinos whose votes went uncounted were qualified to vote. In holding that the plaintiffs had not shown that Proposition 200 had a statistically significant impact on Latino voters, the district court implicitly rejected Lanier's testimony, a conclusion that is "plausible in light of the record viewed in its entirety." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985).

*son v. Cooney*, 230 F.3d 1113, 1119 (9th Cir. 2000) (citing *Gingles*, 478 U.S. at 78-79). We review de novo the district court's legal determinations and mixed findings of law and fact. *Salt River*, 109 F.3d at 591.

**[11]** The district court did not clearly err in concluding that Gonzalez failed to establish that Proposition 200's polling place provision, *see* Ariz. Rev. Stat. § 16-579, had a disparate impact on Latinos. To prove a § 2 violation, Gonzalez had to establish that this requirement, as applied to Latinos, caused a prohibited discriminatory result. Here, Gonzalez alleged that "Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to . . . cast a ballot," but produced no evidence supporting this allegation.[34] The record does include evidence of Arizona's general history of discrimination against Latinos and the existence of racially polarized voting. But Gonzalez adduced no evidence that Latinos' ability or inability to obtain or possess identification for voting purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in Latinos having less opportunity to participate in the political process and to elect representatives of their choice. Without such evidence, we cannot say that the district court's finding that Gonzalez failed to prove causation was clearly erroneous. Therefore we affirm the district court's denial of Gonzalez's VRA claim.[35]

---

[34]The dissent likewise fails to cite any evidence to support the theory that Proposition 200's polling place provision "has the effect of keeping Latino voters away from the polls" because it "evokes fear of discrimination." Dis. op. at 4200.

[35]Gonzalez also argues that the district court erred in evaluating one of the Senate Factors and in concluding that the disparate impact on Latinos was statistically insignificant. Because the failure to show causation is dispositive, however, we need not reach these issues.

B

We next consider Gonzalez and ITCA's claim that Proposition 200's polling place provision violates the Twenty-fourth Amendment to the U.S. Constitution.[36]

The Twenty-fourth Amendment provides:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV, § 1. Gonzalez and ITCA do not argue that requiring voters to show identification at the polls is itself a poll tax. Rather, they argue that, because some voters do not possess the identification required under Proposition 200, those voters will be required to spend money to obtain the requisite documentation, and that this payment is indirectly equivalent to a tax on the right to vote.

**[12]** This analysis is incorrect. Although obtaining the identification required under § 16-579 may have a cost, it is neither a poll tax itself (that is, it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax. *Cf. Harman*, 380 U.S. at 541-42.

---

[36]Although ITCA's briefing collapses the Twenty-fourth and Fourteenth Amendment poll tax claims into a single argument, these are different claims that arise under different constitutional amendments. The Twenty-fourth Amendment extends only to federal elections, *see Harman v. Forssenius*, 380 U.S. 528, 540 (1965), whereas the Fourteenth Amendment can also invalidate restrictions on the right to vote in state elections, *see Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). We will therefore address these two claims separately.

Our conclusion is consistent with *Harman*, the only Supreme Court case considering the Twenty-fourth Amendment's ban on poll taxes. In that case, the Court considered a state statute that required voters to either pay a $1.50 poll tax on an annual basis or go through a "cumbersome procedure," *id.* at 541, for filing an annual certificate of residence, *id.* at 530-32. There was no dispute that the $1.50 fee, if it were a freestanding prerequisite for voting, would constitute a poll tax barred by the Twenty-fourth Amendment. *See id.* at 540. Accordingly, the only question before the Court was whether the state "may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence." *Id.* at 538. The Court enunciated the rule that a state may not impose "a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 541. Applying this rule, the Court determined that the state's certificate of residence requirement was a material burden: among other things, the procedure for filing the certificate was unclear, the requirement that the certificate be filed six months before the election "perpetuat[ed] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate," and the state had other alternatives to establish that voters were residents, including "registration, use of the criminal sanction, purging of registration lists, [and] challenges and oaths." *Id.* at 541-43. Accordingly, the Court concluded that it was "constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax." *Id.* at 542.

**[13]** Proposition 200's polling place provision is not a poll tax under *Harman*. Requiring voters to show identification at the polls does not constitute a tax.[37] Nor does the identifica-

---

[37]Voters who use an early ballot to vote do not even have to show identification. Ariz. Rev. Stat. § 16-550(A) (for early ballots, elector identity is verified by signature comparison alone).

tion requirement place a material burden on a voter "solely because of his refusal to waive [his] constitutional immunity" to a poll tax, *id.*; rather, under Proposition 200, all voters are required to present identification at the polls. Because Arizona's system does not, as a matter of law, qualify as a poll tax, we affirm the district court's conclusion that Proposition 200's polling place provision does not violate the Twenty-fourth Amendment.

C

**[14]** Nor is Proposition 200's polling place provision an unconstitutional poll tax under the Fourteenth Amendment's Equal Protection Clause. *Harper* is the leading Supreme Court case considering whether a state law is a poll tax under the Fourteenth Amendment. In *Harper*, the Supreme Court held that a state law levying an annual $1.50 poll tax on individuals exercising their right to vote was unconstitutional under the Equal Protection Clause. 383 U.S. at 664-66 & n.1. The Court held that "the interest of the State, when it comes to voting, is limited to the power to fix qualifications," and that the imposition of poll taxes fell outside this power because "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." *Id.* at 668. Because the state's poll tax made affluence of the voter an electoral standard, and such a standard is irrelevant to permissible voter qualifications, the Court concluded that the tax was invidiously discriminatory and a per se violation of the Equal Protection Clause. *Id.* at 666-67.

Proposition 200's polling place provision falls outside of *Harper*'s rule that "restrictions on the right to vote are invidious if they are unrelated to voter qualifications." *Crawford*, 553 U.S. at 189 (Stevens, J., announcing the judgment of the Court). Requiring voters to provide documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay to obtain the documents. On the contrary, such a

requirement falls squarely within the state's power to fix core voter qualifications. Nevertheless, ITCA argues that the Court's more recent decision in *Crawford*, 553 U.S. 181, extended *Harper*'s holding that an electoral standard based on voter affluence is invidiously discriminatory (and thus a per se violation of the Equal Protection Clause) to encompass indirect fees, such as the fees or costs necessary to obtain identification documents.

ITCA's argument is based on a misreading of *Crawford*. *Crawford* involved an Indiana state requirement that a citizen voting in person or at the office of the circuit court clerk before election day present a photo identification card issued by the government. *Id.* at 185. The state would provide a free photo identification to "qualified voters able to establish their residence and identity." *Id.* at 186. A number of plaintiffs challenged this requirement on the ground that the "new law substantially burden[ed] the right to vote in violation of the Fourteenth Amendment." *Id.* at 187. Although the Court was unable to agree on the rationale for upholding Indiana's photo identification requirement,[38] neither the lead opinion nor the concurrence held that *Harper*'s per se rule applied. *See id.* at 203-04. The lead opinion, upon which ITCA relies, explained that *Harper*'s "litmus test" made "even rational restrictions on the right to vote . . . invidious if they are unrelated to voter qualifications." *Id.* at 189-90. But according to the lead opinion, later election cases had moved away from *Harper* to apply a balancing test to state-imposed burdens on the voting process. *Id.* Under these later cases, a court "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Id.* at 190. The lead opinion then proceeded to apply this balancing test

---

[38]The lead opinion authored by Justice Stevens was joined by Chief Justice Roberts and Justice Kennedy. Justice Scalia filed a concurring opinion joined by Justices Thomas and Alito. Justices Ginsburg, Souter, and Breyer dissented.

to the Indiana photo identification requirement. *Id.* at 191-200. Because *Crawford* did not extend *Harper*'s per se rule to other burdens imposed on voters, it does not support ITCA's argument that Proposition 200's identification requirement is per se invalid.

**[15]** Although ITCA's reliance on *Crawford* is not entirely clear, ITCA does not appear to argue that Proposition 200's polling place provision is invalid under *Crawford*'s balancing test. Such an argument would be unavailing in any event. The lead opinion in *Crawford* held that the burden imposed on citizens who must obtain a photo identification document was not sufficiently heavy to support a facial attack on the constitutionality of the state law, in light of the state's legitimate interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence. *Id.* at 191, 202-03. The same reasoning is applicable here. While the lead opinion noted that photo identification cards were provided for free by Indiana, it also recognized that to obtain these free cards, prospective voters needed to "present at least one 'primary' document, which can be a birth certificate, certificate of naturalization, U.S. veterans photo identification, U.S. military photo identification, or a U.S. passport." *Id.* at 198 n.17. Obtaining these primary documents, the Supreme Court acknowledged, may require payment of a fee. *Id.* Because Proposition 200's polling place provision allows voters to present these same sorts of primary documents, Proposition 200 is no more burdensome than the identification requirement upheld in *Crawford*. Nor has ITCA suggested any reason why Arizona's interests in imposing a photo identification requirement would be less weighty than the state interests at issue in *Crawford*. Therefore, even under the balancing test set forth in *Crawford*'s lead opinion, we would uphold Proposition 200's polling place identification requirement against a facial challenge.

In sum, because any payment associated with obtaining the documents required under Proposition 200's polling place

provision is related to the state's legitimate interest in assessing the eligibility and qualifications of voters, the photo identification requirement is not an invidious restriction under *Harper*, and the burden is minimal under *Crawford*. As such, the polling place provision does not violate the Fourteenth Amendment's Equal Protection Clause.

IV

Our system of dual sovereignty, which gives the state and federal governments the authority to operate within their separate spheres, "is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* (internal quotation marks omitted). Despite our respect for the state's exercise of its sovereign authority, however, the Constitution's text requires us to safeguard the specific enumerated powers that are bestowed on the federal government. The authority granted to Congress under the Elections Clause to "make or alter" state law regulating procedures for federal elections is one such power. The Framers of the Constitution were clear that the states' authority to regulate federal elections extends only so far as Congress declines to intervene. *See* U.S. Const. art. 1, § 4, cl. 1; *Foster*, 522 U.S. at 69. Given the paramount authority delegated to Congress by the Elections Clause, we conclude that the NVRA supersedes Proposition 200's conflicting registration requirement for federal elections, Ariz. Rev. Stat. § 16-166(F). We uphold Proposition 200's polling place provision with respect to all other claims.[39]

**AFFIRMED in part and REVERSED in part.**

---

[39]Each party shall bear its own costs on appeal.

## APPENDIX A

(NOTE: APPENDIX A and APPENDIX B,
slip op. pages 4161-4191, is posted separately)

Chief Judge KOZINSKI, concurring:

I find this a difficult and perplexing case. The statutory language we must apply is readily susceptible to the interpretation of the majority, but also that of the dissent. For a state to "accept and use" the federal form could mean that it must employ the form as a complete registration package, to the exclusion of other materials. This would construe the phrase "accept and use" narrowly or exclusively. But if we were to give the phrase a broad or inclusive construction, states could "accept and use" the federal form while also requiring registrants to provide documentation confirming what's in the form. This wouldn't render the federal form superfluous, just as redundant braking systems on cars and secondary power supplies on computers aren't superfluous. This is known colloquially as wearing a belt and suspenders, and is widely used to safeguard against failure of critical systems (i.e., getting caught with your pants down). *See Redundancy (engineering)*, Wikipedia, http://goo.gl/ce8il (last visited Jan. 9, 2012).

The two constructions embody different, and somewhat antithetical, policies. The narrow construction maximizes federal control and national uniformity at the expense of state autonomy and local control. The broad construction defers to state and local interests while sacrificing national uniformity. As a linguistic matter, neither construction of "accept and use" strikes me as superior.

If Congress had made it clear that states must accept the federal form as a complete application, or that they need not, I would cheerfully enforce either command. But Congress used tantalizingly vague language, which would make it very useful to fall back on a rule of construction, such as the Clear Statement Rule or the Presumption Against Preemption. Judge Ikuta is right, however, that the Supreme Court has so far adopted such rules only for Supremacy Clause cases, not for those arising under the Elections Clause. *See* maj. op. at 4127-29.

There would, I believe, be ample justification for adopting such rules for Elections Clause preemption. While the federal government has an interest in how elections for federal office are conducted, the states are not disinterested bystanders. Federal elections determine who will represent the state and its citizens in Congress, the White House and, indirectly, the federal courts. Making sure that those representatives are chosen by the state's qualified electors is of vital significance to the state and its people. Moreover, the federal government is commandeering the state's resources, giving states a significant stake in ensuring that the process is conducted efficiently and fairly. Rightly or wrongly, many still blame (or credit) voting irregularities in Illinois for John F. Kennedy's election as President in 1960, and in Texas for Lyndon Johnson's election to the Senate in 1948. States have an interest in ensuring that their reputations aren't soiled in this fashion for decades, maybe longer. The risk of fraud and other malfeasance may depend on local conditions and thus differ from state to state. States with a tradition of electoral chicanery, or with large transient populations, may need to impose stricter controls to ensure the integrity of their voting processes.

The fact remains that the Supreme Court has never articulated any doctrine giving deference to the states under the Elections Clause. This may be because it hasn't had occasion to do so in modern times. *Foster* v. *Love*, 522 U.S. 67 (1997), was an easy case where the state's election scheme directly contradicted the constitutional text, while the state's interest in avoiding a general election on the same day as the rest of the country was slight. A case such as ours, where the statutory language is unclear and the state has a compelling interest in avoiding fraudulent voting by large numbers of unqualified electors, presents a far more suitable case for deciding whether we should defer to state interests. But only the Supreme Court can adopt such a doctrine.

In the absence of something better, I must resort to secondary aids to construction. In this case, we have legislative his-

tory that supports reading "accept and use" in the exclusive sense, which would preclude states from seeking additional documentation. Senator Simpson proposed amending the bill that eventually became the NVRA to provide that "[n]othing in this Act shall be construed to preclude a State from requiring presentation of documentary evidence of the citizenship of an applicant for voter registration." 139 Cong. Rec. 5098 (Mar. 16, 1993). He explained his purpose: "It allows States to check documents to verify citizenship. . . . [I]t simply makes clear that this bill must not be interpreted to stop any particular State from requiring documents. This includes States which currently by State law check documents, as well as those who may wish to check documents in the future. . . . I offer my amendment to try to ensure that States will continue to have the right, if they wish, to require documents verifying citizenship . . . ." *Id.* at 5098-99. Senator Simpson understood that "accept and use" could be read narrowly to preclude states from seeking documentation beyond the federal form, and offered his amendment to ensure that the phrase would be construed in the broad, inclusive sense.

Senator Ford, the NVRA's sponsor, responded: "[T]here is nothing in the bill now that would preclude the State's requiring presentation of documentary evidence of citizenship. I think basically this is redundant, even though you probably put it in a section. But there is nothing in there now that would preclude it." *Id.* at 5099. Senator Ford seemed to believe that "accept and use" was already being used in the inclusive sense, and was amenable to adding language that would confirm this.

The Senate adopted the Simpson amendment, but the House bill lacked a similar provision. The Conference Committee adopted the House version, explaining that "[t]he conferees agree with the House bill and do not include this provision from the Senate amendment. It is not necessary or consistent with the purposes of this Act. Furthermore, there is concern that it could be interpreted by States to permit regis-

tration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act. It could also adversely affect the administration of the other registration programs as well. . . . These concerns lead the conferees to conclude that this section should be deleted." H.R. Rep. No. 103-66, at 23-24 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140, 148-49 (Conf. Rep.). The conferees thus rejected the Simpson amendment, not because they thought it superfluous (as did Senator Ford) but because the inclusive meaning of "accept and use" was inconsistent with their vision of how the Act should operate.

After the conference, the Senate re-passed the NVRA without the Simpson amendment. S. Rep. No. 103-6, at 12-13 (1993). A minority of senators opposed the bill in part because they thought "requiring proof of citizenship" would be helpful in combating fraud and worried that the bill "would preclude such corrective action." *Id.* at 50.

In the House, some members sought to recommit the bill in order to tack on a Simpson-like amendment. They argued that failure to do so would encourage voter fraud. *See* 139 Cong. Rec. at 9228 (May 5, 1993) (Rep. Livingson: "Without this provision, this bill is an auto-fraudo bill."); *id.* at 9229 (Rep. Cox: "Despite its benign name, this pernicious bill would make it nearly impossible to prevent ineligible people— including illegal aliens—from voting."). Their arguments fell on deaf ears. *Id.* at 9231.

The Supreme Court has warned us time and again not to rely on legislative history in interpreting statutes, largely because of the ease with which floor statements and committee reports can be manipulated to create a false impression as to what the body as a whole meant. But the history here consists of actions taken by legislative bodies, not just words penned by staffers or lobbyists. The Court has recognized that such drafting history *can* offer interpretive insight: "Congress' rejection of the very language that would have

achieved the result the Government urges here weighs heavily against the Government's interpretation." *Hamdan* v. *Rumsfeld*, 548 U.S. 557, 579-80 (2006). While the dissenting Justices in *Hamdan* objected to the use of legislative history, their objection rested in large part on the fact that it was being used to defeat clear statutory language. *See id.* at 665-68 (Scalia, J., dissenting, joined by Thomas and Alito, JJ.). I'm not convinced they would object with equal vigor where, as here, the statutory language is in equipoise and both chambers affirmatively rejected efforts to authorize precisely what Arizona is seeking to do.

The dissent mistakenly sees some inconsistency between my conclusion today and that in my "well-drafted dissent to the original panel opinion." Dissent at 4211 n.1. But, as a member of a three-judge panel, I had no occasion to construe the statute de novo because we were bound by the law of the circuit and the law of the case. *Gonzalez* v. *Arizona*, 624 F.3d 1162, 1198-99 (9th Cir. 2010) (Kozinski, C.J., dissenting in large part). To the extent I could reach the issue at all, it was only to determine whether "*Gonzalez I* is clearly wrong." *Id.* at 1208. Because I concluded then, as I do now, that "both preemptive and non-preemptive constructions of 'accept' and 'use' are plausible," I deferred to the earlier panel's construction. *Id.* at 1206. As an en banc court, we cannot defer to *Gonzalez I*. Rather, we must come up with what we think is the best construction of the statute. For the reasons outlined above, and those in Judge Ikuta's very fine and thorough opinion, I believe the preemptive reading of the statute is somewhat better than the alternative.

---

BERZON, Circuit Judge, concurring, with whom MURGUIA, Circuit Judge, joins:

I fully concur in the majority opinion but note the following: With respect to whether Proposition 200's polling place

provision "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" in violation of § 2(a) of the VRA, 42 U.S.C. § 1973(a), the court holds only that the *current record* is insufficient to show a "causal connection between the challenged voting practice and [a] prohibited discriminatory result," *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (alteration in original) (internal quotation marks omitted). I concur in Section III.A of the majority opinion with that understanding of its limited reach. A different record in a future case could produce a different outcome with regard to the § 2 causation question.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Proposition 200's registration provision violates the National Voter Registration Act ("NVRA"). *See* Maj. Op. at 4148. I part ways with the majority, however, when it comes to Proposition 200's requirement that voters provide identification at the polls ("the polling place provision"). The majority concludes that Gonzalez's challenge to the polling place provision under Section 2 of the Voting Rights Act fails because Gonzalez has not established that the polling place provision "results in discrimination on account of race." Maj. Op. at 4151. I respectfully disagree with the majority, for two reasons.

First, in concluding that Proposition 200's polling place provision does not disparately impact Latino voters, the majority conflates statistics on Proposition 200's *registration provision* with Proposition 200's *polling place provision*. *See* Maj. Op. at 4152-53. A thorough review of the record reveals that Proposition 200's *polling place provision* has a significant disproportionate impact on Latino voters. In the 2006 general election, Latino voters comprised between 2.6% and

4.2% of the voters who turned out to vote, but Latino voters cast 10.3% of the ballots that went uncounted because of insufficient identification. Latino voters were over-represented by 200% to 500% in ballots that were uncounted because of insufficient identification.

Second, the majority mistakenly gives short shrift to the "Senate Factors" from *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986).[1] In discussing these factors, the majority acknowledges that Latino voters have "suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting." Maj. Op. at 4152. Despite acknowledging these facts, the majority concludes that Proposition 200's polling place provision does not result "in discrimination on account of race." Maj. Op. at 4151. But a proper Section 2 analysis requires that we "consider how the challenged practice 'inter-

---

[1]In *Gingles* the Supreme Court held that a court should consider the following factors, commonly referred to as the "Senate Factors," in determining whether a plaintiff has established a violation of Section 2 of the Voting Rights Act:

> [T]he history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45.

acts with social and historical conditions' " to cause an inequality in the opportunities of Latino voters to cast their ballots. *Farrakhan v. Washington*, 338 F.3d 1009, 1016 (9th Cir. 2003) (quoting *Gingles*, 478 U.S. at 47).

Indeed, as the district court recounted in much detail, *de jure* discrimination against Latinos in Arizona existed during most of the twentieth century. Just prior to 1910, Arizona voters passed a literacy law that explicitly targeted Mexicans and disqualified non-English speakers from voting in state elections. As late as the 1960s, these literacy requirements were a precondition for voting in Arizona.

After Arizona attained statehood in 1912, the new state government engaged in an anti-immigrant campaign characterized by a series of proposals aimed at restricting the political rights of Mexican immigrants' and limiting their right to work. The new Arizona constitution restricted non-citizens from working on public projects. In 1914, the Arizona legislature enacted the "eighty percent law," which stated that eighty percent of the employees in businesses that had five or more employees had to be "native-born citizens of the United States."

Segregation of Latinos in housing and public accommodations was also common in Arizona during most of the twentieth century. In the years immediately following World War II, the city of Phoenix segregated Latino veterans in separate housing units. Movie theaters, restaurants, and stores frequently excluded Latinos or required Latinos to sit in segregated areas. Public parks and swimming pools were also segregated. A particularly notorious example of this segregation occurred in Tempe, where Latinos were only permitted to use the public swimming pool the day before the pool was drained.

In my view, statistics showing that Proposition 200's polling place provision disparately impact Latino voters, when

coupled with Arizona's long history of discrimination against Latinos, current socioeconomic disparities between Latinos and whites in Arizona, and racially polarized voting in Arizona, establish that Proposition 200's polling place provision results in discrimination on account of race.

History has also shown that when a Latino voter approaches the polling place but is stopped by a person perceived to be an authority figure checking for identification, there's something intimidating about that experience that evokes fear of discrimination. This intimidation has the effect of keeping Latino voters away from the polls.

In sum, I would hold that Proposition 200's polling place provision results in discrimination on account of race, in violation of Section 2 of the Voting Rights Act.

---

RAWLINSON, Circuit Judge, joined by Judge N.R. Smith, concurring in part and dissenting in part:

I concur in the majority's conclusion that Arizona's Proposition 200, which amended Ariz. Rev. Stat. § 16-579 to require proof of identification prior to receiving a ballot, does not violate the Voting Rights Act or the Equal Protection Clause of the Fourteenth Amendment. I also agree that the statutory amendment did not constitute a poll tax as proscribed in the Twenty-fourth Amendment to the United States Constitution. As a result, I join Part III of the majority opinion.

I respectfully dissent from the balance of the majority opinion, because I am not persuaded that application of Proposition 200's proof-of-citizenship provision to prospective voters using the National Mail Voter Registration Form (the Federal Form) is precluded by the National Voting Rights Act (NVRA). In my view, there is no conflict between the NVRA

and Arizona's proof-of-citizenship requirement. In fact, the plain text of the NVRA validates Arizona's proof-of-citizenship requirement, even while recognizing that Arizona must "accept and use" the Federal Form.

The text of the NVRA allows for Arizona's proof-of-citizenship requirement, notwithstanding whether a presumption against preemption generally exists under the Election Clause, as it does under the Supremacy Clause. The NVRA states the following:

> In addition to accepting and using the [Federal Form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title for the registration of voters in elections for Federal office.

42 U.S.C. § 1973gg-4(a)(2). Therefore, the plain text of the NVRA authorizes a state to "develop and use a mail voter registration form . . . for the registration of voters in elections for Federal office," in addition to the Federal Form if it "meets all of the criteria stated in section 1973gg-7(b)." As part of such criteria, the NVRA provides that a mail voter registration form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to *assess the eligibility* of the applicant . . ." 42 U.S.C. § 1973gg-7(b)(1) (emphasis added). Section 1973gg-7(b)(2) then specifies that citizenship is a necessary eligibility requirement. Thus, the NVRA expressly allows Arizona to require proof of eligibility, such as proof of citizenship, because "it is identifying information . . . necessary to enable the . . . State election official to assess eligibility," and Arizona accepts and uses the Federal Form. *See* 42 U.S.C. § 1973gg-7(b)(1).

I emphasize the point that the NVRA itself expressly, not merely implicitly, authorizes a state to "develop and use" its own form "for the registration of voters in elections for Fed-

eral office," in addition to accepting and using the [Federal Form]." 42 U.S.C. § 1973gg-4(a)(2). Because a state must accept and use the Federal Form but is also expressly authorized to develop and use its own form that meets the criteria in § 1973gg-7(b), the plain text creates a minimum standard through the Federal Form and allows a state to require more as long as it is within the bounds of § 1973gg-7(b). *See Hui v. Castaneda*, 130 S. Ct. 1845, 1855 (2010) ("We are required, however, to read the statute according to its text. . . ."); *Arkansas v. Farm Credit Servs. of Cent. Ark.,* 520 U.S. 821, 827 (1997) (noting that it is a "basic principle that statutory language is to be enforced according to its terms"). While state forms must comply with the same general standards as the Federal Form, there is no mandate that states must use only the information included in the Federal Form or that the Federal Form is a complete application. *See* 42 U.S.C. § 1973gg-4(a)(2). States have the same discretion to decide the contents of the form they develop and use, when drafted in accordance with § 1973gg-7(b), as the Election Assistance Commission (EAC) had for the Federal Form's requirements. *See* 42 U.S.C. §§ 1973gg-4(a)(2), 1973gg-7(b). Thus, the statute expressly authorizes a state, as long as it complies with the standards set forth in § 1973gg-7(b), to require additional information outside of the Federal Form for voter registration. I do not know how to more clearly and emphatically stress the point that the plain text of the statute allows Arizona to require proof-of-citizenship in elections for federal office.

The majority argues that the NVRA preempts the proof-of-citizenship requirement, because the NVRA requires states to "accept and use" the Federal Form and Proposition 200's requirement to " 'reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship' . . . do not operate harmoniously. . . ." *Majority Opinion*, p. 4138-39 (citing Ariz. Rev. Stat. § 16-166(F)). The majority rejects Arizona's argument that the statutes are harmonious, because Arizona is accepting and using the Federal Form for voter registration as long as evidence of citizenship

is provided pursuant to the state form requirement. *See id*. at 4139-40. The majority reasons that rejecting voter registration based on anything outside the Federal Form is inappropriate because it "is contrary to the form's intended use and purpose." *Id.* at 4140. Further, the majority opines that its reading is consistent with the "natural reading of the NVRA." *Id.* I disagree.

The terms of the statute trump the intended use and purpose of the Federal Form. *See Lockart v. United States*, 546 U.S. 142, 146 (2005) ("The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.") (citation omitted); *see also Siripongs v. Davis,* 282 F.3d 755, 758 (9th Cir. 2002) ("In interpreting the statute we look to general principles of statutory construction and begin with the language of the statute itself." If the "language is clear on its face, the sole function of the court is to enforce it according to its terms. . . .") (citation, alteration and internal quotation marks omitted). Further, the "accept and use" provisions of the NVRA do not establish a conflict between Proposition 200 and the NVRA where one is not otherwise present in the *text* of the statutes. Reading the requirement to "accept and use" the Federal Form in § 1973gg-4(a)(1) along with § 1973gg-4(a)(2) does not naturally lead to the conclusion that no requirement outside the Federal Form may disallow a voter's registration. The relevance and importance of § 1973gg-4(a)(2) is paramount. Invalidating the registration provision ignores § 1973gg-4(a)(2), which qualifies the extent to which a state must depend on the Federal Form for federal voter registration—i.e., the Federal Form is not the exclusive form.

The majority seems to read § 1973gg-4(a)(2) in such a way as to acknowledge a state's right to develop and use its own form (if compliant with § 1973gg-7(b)), but that a state form cannot require anything more than the Federal Form or cause a voter to be ineligible to register to vote in federal elections.

However, a more logical and appropriate reading is that the Federal Form acts as the default—setting minimum requirements—, and a state may require additional requirements for federal elections through its own form if the requirements comply with the criteria of the statute (essentially setting the maximum available requirements that may be used in the state form). *See La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 370 (1986) ("[W]here possible, provisions of a statute should be read so as not to create a conflict. . . ."). Therefore, there is flexibility while providing for control through the standards in § 1973gg-7(b). The Federal Form acts as a baseline while the criteria in § 1973gg-7(b) act as outer limits.

The requirement to "accept and use" the Federal Form does not preclude states from imposing additional requirements. First, accepting and using something does not mean that it is necessarily sufficient. For example, merchants may accept and use credit cards, but a customer's production of a credit card in and of itself may not be sufficient. The customer must sign and may have to provide photo identification to verify that the customer is eligible to use the credit card. Second, the ordinary and natural meaning of the word "use" is "to employ" or "derive service from . . .". *Smith v. United States*, 508 U.S. 223, 228-29 (1993) (citation omitted). The word "accepts" means "to adopt, to agree to carry out provisions, to keep and retain." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 344 (4th Cir. 2008) (citing Black's Law Dictionary 12 (5th ed.1979)). It is undisputed that Arizona has employed and derived service from the Federal Form and adopted its use for the registration of voters in federal elections. The only real issue is whether Proposition 200's requirement of proof of citizenship so conflicts with the use of the Federal Form that the requirement of proof of citizenship should be voided.

I realize that the majority's argument that "rejecting" necessarily counters "accepting" has some superficial appeal. *See Majority Opinion*, p. 4139. However, what is being argued is

whether states must accept and use the Federal Form in their federal election procedures as a whole, or whether they must accept the Federal Form as completely sufficient and the *sole* requirement for voter registration. Thus, the point of contention is whether Arizona defies the demand to accept and use the Federal Form by not finding voter registration wholly sufficient based solely on the Federal Form. The answer cannot be that the Federal Form is the end-all-be-all. Section 1973gg-4(a)(2) clarifies that "accept and use" cannot mean that a state must allow a voter to register solely on the basis of the Federal Form, because it specifically allows a state to develop and use a state form, in addition to the Federal Form, for federal elections. It is beyond my understanding how the Federal Form can be considered "the end" when the NVRA explicitly allows states to develop and use a form "*[i]n addition* to accepting and using the [Federal Form]." 42 U.S.C. § 1973gg-4(a)(2) (emphasis added).

No provision of the NVRA expressly forbids states from requiring additional identifying documents to verify a voter's eligibility. The NVRA only expressly prohibits states from requiring "notarization or other formal authentication." 42 U.S.C. § 1973gg-7(b)(3). "We . . . read the enumeration of one case to exclude another [if] it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it. . . ." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation omitted). Here, Congress prohibited requiring notarization or other formal authentication but failed to prohibit proof-of-citizenship, while expressly recognizing its importance in voter registration. *See* 42 U.S.C. § 1973gg-7(b); *see also Kucana v. Holder*, 130 S. Ct 827, 838 (2010) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and citation omitted)). Nor does the NVRA state that it is the *exclusive* authority on eligibility verification or that "Arizona's *only* role was to make [the Federal] [F]orm available to

applicants and to 'accept and use' it for the registration of vot-ers." *Majority Opinion*, p. 4143 (emphasis added). The lan-guage of the statute not only does *not* prohibit additional documentation requirements, it permits states to "require . . . such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant . . ." 42 U.S.C. § 1973gg-7(b)(1).

If, as the majority believes, the requirement to accept and use the Federal Form and the express allowance for a state to develop and use a form that complies with the set criteria of the statute are contradictory, *see Majority Opinion*, pp. 4139-43, then the court "must interpret the statute to give effect to both provisions where possible." *See Ricci v. DeSte-fano*, 129 S. Ct. 2658, 2674 (2009) (citation omitted). Here, it is possible and necessary to interpret the statute as requiring states to accept and use the Federal Form, while allowing states to demand adherence to their form and specific require-ments for federal voter registration if in compliance with § 1973gg-7(b).

Reading the statute as a whole solidifies my conclusion that Arizona's registration provision is valid. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010) ("We do not . . . con-strue statutory phrases in isolation; we read statutes as a whole." (citation and alteration omitted)); *see also, K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascer-taining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the lan-guage and design of the statute as a whole. . . .") (citation omitted). Besides the express authorization for a state to "de-velop and use" a form compliant with the statute's criteria, 42 U.S.C. § 1973gg-4(a)(2), the NVRA also provides that "each State shall establish procedures to register to vote in elections for Federal office . . . (2) by mail application pursuant to sec-tion 1973gg-4 of this title, . . . *in addition to any other method of voter registration provided for under State law*," *id.* § 1973gg-2(a) (emphasis added). Although the NVRA

requires that states "accept and use" the Federal Form, *id.* § 1973gg-4(a)(2), the NVRA does not foreclose states from using other methods for registering voters, *id.* § 1973gg-2(a), and allows states to develop and use state specific forms, if those forms fit within set criteria, *id.* § 1973gg-4(a)(2). Therefore, Congress did not "assume exclusive control of the *whole* subject . . . ." *Ex Parte Siebold*, 100 U.S. 371, 383 (1879) (emphasis in the original). Arizona is allowed to require proof of citizenship for federal voter registration because of its expressly granted authority to develop and use a form complying with § 1973gg-7(b) and may deny voter registration for federal office for lack of such proof. *See id.* at 392 ("[W]e think it clear that the clause of the Constitution relating to the regulation of such elections contemplates such co-operation whenever Congress deems it expedient to interfere merely to alter or add to existing regulations of the State . . . .").

The majority notes that, if Arizona is correct that §§ 1973gg-4(a)(2) and 1973gg-7(b) allow the registration provision, "this would mean only that the NVRA allows Arizona to include a proof of citizenship requirement on its State Form." *Majority Opinion*, p. 4143 (citation omitted). "It would not mean that Arizona has authority to add this requirement to the Federal Form . . ." *Id.* However, this conclusion ignores the specific language of § 1973gg-4(a)(2). That language allows states to develop and use a state form complying with the statute's criteria for federal elections.

The majority also asserts that, even if the NVRA allows a state form to include additional conditions within the parameters of § 1973gg-7(b) (like proof-of-citizenship), a state may not decline an applicant's voter registration for federal elections because of the applicant's failure to satisfy the additional conditions. *See Majority Opinion*, pp. 4140-41. According to the majority,

> [t]he NVRA's State Form provision, § 1973gg-4(a)(2), merely gives a state more options [and] Con-

gress could have required all states to use *only* the
Federal Form . . . Instead, Congress allowed States
to use their state registration forms to register appli-
cants for both state and federal elections (provided
the state form complies with § 1973gg-7(b)). But
states cannot reject applicants who register for fed-
eral elections who use the Federal Form. . . . *Major-
ity Opinion*, pp. 4140-41 (emphasis by the majority).

Again, the majority's attempt to rebut Arizona's arguments
and this dissent contradicts the language of the NVRA and
leads to an absurd result. Under the majority's argument, the
state form (and the additional conditions allowed in the state
form) have no real effect, because the applicant must only
meet the Federal Form requirements in order to register for
federal elections. Thus, Arizona must allow an applicant, sat-
isfying all but the proof-of-citizenship requirement, to be reg-
istered to vote in federal elections, while not allowing the
applicant to be registered for state elections. This faulty inter-
pretation contradicts the NVRA's plain language that "a State
may develop and use a mail voter registration form that meets
all of the criteria stated in section 1973gg-7(b) of this title for
the registration of voters in elections for Federal office." 42
U.S.C. § 1973gg-4(a)(2) (emphasis added). Put differently,
under the majority's view, a state "registration form that
meets all the criteria stated in section 1973gg-7(b)" but that
includes an additional condition beyond the Federal Form
requirements may not be used to register "voters in elections
for Federal office," although the state form is specifically
allowed by the language in § 1973gg-4(a)(2).

In addition, the majority believes that my interpretation of
§ 1973gg-4(a)(2) substitutes "instead of" for "[i]n addition
to." *Majority Opinion*, p. 4141. However, my interpretation is
loyal to the wording "[i]n addition to," because the Federal
Form requirements must be met. State form requirements,
constrained by § 1973-gg-7(b), are added to the Federal Form
requirements. In contrast, the majority's view of § 1973gg-

4(a)(2) basically strikes the statute's text allowing state forms to be used "[i]n addition to" the Federal Form "for the registration of voters in elections for Federal office."

The majority's view makes voter registration burdensome for states. For example, an Arizona applicant meeting the Federal Form requirements, but lacking proof-of-citizenship, would have to be allowed to vote for federal officials but could not vote for state officials. States that desire a proof-of-citizenship requirement in their state forms (as the majority suggests is allowed by the NVRA), would be forced to track whether their residents are registered to vote for federal elections, state elections, or both. In essence, the majority's alteration of the statute imposes an unnecessary burden on the states. Although "it is not our task to assess the consequences of each approach and adopt one that produces the least mischief[,]" *Lewis v. City of Chi., Ill.*, 130 S. Ct. 2191, 2200 (2010), the majority's view, ignoring the plain meaning of the NVRA, cannot be what Congress intended. This is especially true when one considers that the statutory allowance for a state form does not displace the importance of the Federal Form or the delegated authority to the EAC to determine the contents of the Federal Form. The Federal Form maintains its importance, because its use is required in all states. The Federal Form, therefore, establishes a minimum set of requirements. The EAC's rejection of Arizona's request to include a proof-of-citizenship requirement demonstrates that the EAC served its purpose of establishing a minimum (not a maximum) set of requirements for all states. Then, states individually are allowed to impose additional requirements within the strict bounds of § 1973gg-7(b).

The majority believes that the proof-of-citizenship requirement disrupts the goal of the NVRA—to streamline the registration process. *See Majority Opinion*, pp. 4142-44. Although the NVRA seeks to simplify and harmonize registration procedures, the statute also identifies "protect[ing] the *integrity* of the electoral process" and "enhanc[ing] the participation of

*eligible* citizens as voters in elections for Federal office" as guiding purposes of the statute. 42 U.S.C. § 1973gg(b) (emphasis added). Even under the majority's complementary analysis conducted pursuant to *Seibold* and *Foster v. Love*, 522 U.S. 67 (1997), *see Majority Opinion*, p. 4131, Arizona's proof-of-citizenship procedure complements—rather than conflicts with—these important purposes. *See Siebold*, 100 U.S. at 384; *Foster*, 522 U.S. at 74 (holding that a state election law is preempted only "to [the] extent [that] it conflicts with federal law"). The stated harmonious purposes are not served if ineligible voters are allowed to register.

Finally, even though allowing states to "develop and use" their own forms (if compliant with § 1973gg-7(b)) may decrease the efficiency of a Federal Form, this policy consideration cannot overrule the express terms of the statute. *DePierre v. United States,* 131 S. Ct. 2225, 2233 (2011) ("That we may rue inartful legislative drafting, however, does not excuse us from the responsibility of construing a statute as faithfully as possible to its actual text. . . .") (footnote reference omitted); *Lewis*, 130 S. Ct. at 2200 ("Truth to tell, however, both readings of the statute produce puzzling results. . . . In all events, it is not our task to assess the consequences of each approach and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted. . . ."); *cf. United States v. Kennedy*, 643 F.3d 1251, 1266 (9th Cir. 2011) (Ikuta, J.) (determining that a statute compensating victims of child pornography was "a poor fit for these types of offenses[,]" but acknowledging that "the responsibility lies with Congress, not the courts, to develop a scheme to ensure that defendants . . . are held liable . . .").

In sum, the majority's holding hinges on § 1973gg-4(a)(1)'s requirement that states "accept and use" the Federal Form. However, § 1973gg-4(a)(2) also allows a state to "develop and use" its own form if it complies with the broad standards in § 1973gg-7(b). Therefore, I am unable to see how Arizona's registration provision squarely conflicts with the

NVRA or how the NVRA "assume[s] exclusive control of the *whole* subject. . . ." *Siebold*, 100 U.S. at 383 (emphasis in the original).[1]

---

[1]Chief Judge Kozinski describes the NVRA as "readily susceptible to the interpretation of the majority, but also that of the dissent. . . ." *Concurring Opinion*, p. 4192. His well-drafted dissent to the original panel opinion said it better. *See Gonzalez v. Arizona (Gonzalez II)*, 624 F.3d 1162, 1206 (9th Cir. 2010) (Kozinski, J., dissenting) ("The NVRA doesn't say that states must treat the federal form as a complete application. . . . There's no question that Arizona accepts and uses the federal form for the information contained in it. Arizona only asks for proof of citizenship in addition to the form in order to complete the registration process."), *reh'g en banc granted & opinion withdrawn*, 649 F.3d 953 (9th Cir. 2011). This en banc concurrence discusses the statutory language "accept and use" in isolation, with no reference to the "[i]n addition" language in 42 U.S.C. § 1973gg-4(a)(2), *see Concurring Opinion*, again diverging from his prior dissent, where he noted: "[S]ection 1973gg-4(a)(2) . . . allows states to 'develop and use' their own form if it 'meets all of the criteria stated in section 1973gg-7(b).' [*Gonzalez v. Arizona (Gonzalez I)*, 485 F.3d 1041 (9th Cir. 2007),] reads the statute correctly; it is the majority here that is mistaken." *Gonzalez II*, 624 F.3d at 1205. In fact, Chief Judge Kozinski previously identified a basic problem with the majority's view via a single question: "[I]f the statute permits zero deviation from the federal form, why permit states to develop their forms at all? The only development needed would be photocopying the federal form." *Id.* at 1209.

To determine its meaning, all of the NVRA's language must be read together and not in isolation. *See Samantar*, 130 S. Ct. at 2289 ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole. . . .") (citation and alteration omitted). When read together, the meaning is clear. States must accept and use the Federal Form for registering voters for federal elections, but may also develop and use a state form with additional conditions if they comply with § 1973gg-7(b). When the meaning of the statute is clear, reverting to legislative history is inappropriate. *See Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 665-68 (2006) (Scalia, J., dissenting) ("We have repeatedly held that . . . reliance [on legislative history] is impermissible where, as here, the statutory language is unambiguous. . . .").

The legislative history is also unhelpful here, because it is unreliable. "[L]egislative history is itself often murky, ambiguous, and contradictory." *Exxon Mobile*, 545 U.S. at 568; *see also Conroy v. Aniskoff*, 507 U.S.

*Siebold* meticulously outlined the interplay between election regulations promulgated by a state government and Congress respectively. In the process, the United States Supreme Court took care to emphasize the respect that should be accorded the procedures implemented by states. *See Siebold*, 100 U.S. at 394 ("State rights and the rights of the United States should be equally respected. *Both are essential* to the preservation of our liberties and the perpetuity of our institu-

---

511, 519 (1993) (Scalia, J., concurring) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. As the Court said in 1844: 'The law as it passed is the will of the majority of both houses, *and the only mode in which that will is spoken is in the act itself* . . . .") (quoting *Aldridge v. Williams*, 44 U.S. 9, 24 (1845) (emphasis in the original). In fact, this case is a glaring example of the flaws of using legislative history. Although the legislative history cited by Chief Judge Kozinski supports his reasonable argument, the original view of the NVRA's sponsor casts doubt on the clarity of that legislative history. Senator Ford, the sponsor of the bill, thought that "there is nothing in the bill now that would preclude the State's requiring presentation of documentary evidence of citizenship." 139 Cong. Rec. S2897-4, at S2902 (Mar. 16, 1993). He thought that an amendment specifying that a state could require proof-of-citizenship was redundant. *See id*. Therefore, even though the Conference Committee opined that the unamended NVRA disallowed proof-of-citizenship, H.R. Rep. No. 103-66, at 20 (1993), reprinted in 1993 U.S.C.C.A.N. 140, 148-49 (Conf. Rep.), it is unclear how many of the members of Congress who voted for the NVRA agreed with Senator Ford. *See Exxon Mobile*, 545 U.S. at 570 ("The utility of either can extend no further than the light it sheds on how the enacting Legislature understood the statutory text. Trying to figure out how to square the Subcommittee Working Paper's understanding with the House Report's understanding, or which is more reflective of the understanding of the enacting legislators, is a hopeless task."); *cf. Hamdan*, 548 U.S. at 666 (Scalia, J., dissenting) ("Whether the floor statements are spoken where no Senator hears, or written where no Senator reads, they represent at most the views of a single Senator. . . ."). As has been previously said, "[j]udicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.' " *Exxon Mobile*, 545 U.S. at 568 (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)).

tions. But, in endeavoring to vindicate the one, we should not allow our zeal to nullify or impair the other.") (emphasis added).

The Supreme Court recognized the right of Congress to exercise its power to enact voting regulations that would supersede regulations promulgated by a state. *See id.* at 393. However, the Supreme Court also noted that "we are bound to presume that Congress has done so in a judicious manner; that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations . . . ." *Id.*

The Supreme Court further reasoned that the power of Congress to enact statutes governing state matters "does not derogate from the power of the State to execute its laws *at the same time and in the same places* . . . ." *Id.* at 395 (emphasis added). The laws of the state are preempted if, and only if, "*both cannot be executed* at the same time . . . ." *Id.* (emphasis added).

In *Siebold*, there was no dispute regarding a conflict between the state and federal regulations. Rather, the question raised was whether Congress may enact partial regulations to be implemented together with state regulations governing election procedures. *See id.* at 382. Having answered that question in the affirmative, the Supreme Court denied the writ of habeas corpus filed by defendants who were convicted of violating the federal laws. *See id.* at 374, 399.

*Foster*, the more recent case, addressed an actual conflict between a state law and a federal law. Indeed, in *Foster* a blatant conflict existed between federal statutes requiring Congressional elections to be held "the Tuesday after the first Monday in November in an even-numbered year" and a state statutory scheme under which no election was held on the date designated by Congress if a candidate received a major-

ity of the votes during an earlier "open primary" election. 522 U.S. at 68-69.

The Supreme Court explained that the issue to be decided was "a narrow one *turning entirely* on the meaning of the state and federal statutes . . ." *Id.* at 71 (emphasis added). The Court defined election as encompassing "the combined actions of voters and officials meant to make a final selection of an officeholder . . ." *Id.* The Court noted that Congress had established the Tuesday following the first Monday in November as "the day" for electing members of Congress. *Id.* Because the system in Louisiana was "concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress," the Louisiana statute conflicted with 2 U.S.C. § 7, and was preempted. *Id.* at 73.

Because no Congressional election was to be held on the date Congress explicitly designated as "the day" for holding Congressional elections, the Louisiana statutory scheme clearly and directly conflicted with § 7. Reiterating that federal law "mandates holding all elections for Congress . . . on a single day throughout the Union," *id.* at 70, the Court voided Louisiana's statutory scheme. *See id.* at 74.

Unlike the statutory scheme voided in *Foster*, Proposition 200's proof-of-citizenship provision does not present the blatant conflict addressed by the Supreme Court in that case. Indeed, the majority rests its analysis on what it perceives to be the "expansive" sweep of the Elections Clause. *Majority Opinion*, p. 4126-27 n.8. However, the message from *Siebold* is to the opposite effect. After taking great pains to emphasize the equal role of the states in preserving the integrity of federal elections, the Supreme Court counseled that we should not hasten to declare preemption of a state statutory scheme. Indeed, *Siebold* expressly held that the paramountcy of federal law extends only "so far as the two are inconsistent, and no farther . . . ." *Siebold*, 100 U.S. at 386. The Court clarified

that state and federal enactments conflict only "[i]f both cannot be performed . . ." *Id.*

*Foster* couched its holding in similar fashion, clarifying that the preeminence of federal statutes over state statutes applies only to the extent that the two conflict, and only "so far as the conflict extends . . ." *Foster*, 522 U.S. at 69, (*quoting Siebold*, 100 U.S. at 384).

In making the determination whether the Louisiana statutory scheme violated 2 U.S.C. § 7, the Supreme Court focused on the word "election" as used in § 7. *Id.* at 71. The Court consulted a dictionary for the definition of "election" to determine if a conflict existed between Louisiana's statutory scheme and § 7.

It is important to remember that the Supreme Court opined that State enactments are superseded by Federal enactments only "[i]f both cannot be performed . . ." *Siebold*, 100 U.S. at 386. As applied in *Foster*, the state statutory scheme was voided because it was impossible to hold a Congressional election on the designated day if the election was in fact completed on an earlier date. *See Foster*, 522 U.S. at 73.

In my view, the majority opinion has stretched the principle established in *Siebold* and applied in *Foster* beyond its intended bounds.[2]

---

[2]I do not agree that the cases cited on pages 4126-27, n.8 of the majority opinion establish that the Supreme Court has "construed Congress's authority under the Election Clause expansively." Rather, in the earlier years of this nation's existence, when many states resisted the notion of a centralized government, these cases served to emphasize that federal elections conducted in the various states were subject to federal regulation. *See, e.g., The Ku Klux Cases*, 110 U.S. 651, 657-58 (1884) ("If this government is anything more than a mere aggregation of delegated agents of other states and governments, each of which is superior to the general government, it must have the power to protect the elections on which its existence depends, from violence and corruption . . . ."); *id.* at 662 ("This proposition answers, also, another objection to the constitutionality of the laws under consideration, namely, that the right to vote for a member of congress . . . is governed by the law of each state respectively . . . .").

Indeed, both *Siebold* and *Foster* took care to delineate that preemption extended only as far as a conflict exists, and no farther. *See Siebold*, 100 U.S. at 386; *Foster*, 522 U.S. at 69. And a conflict exists only if the two regulations cannot co-exist. *See Siebold*, 100 U.S. at 386. As discussed above, such is not the case for Proposition 200's requirement that a prospective voter present proof of citizenship, when considered with the contents of the Federal Form.

The fact that the NVRA contains a provision precluding the requirement of "notarization of other formal authentication" in no way conflicts with Proposition 200's proof-of-citizenship requirement. Notarization and authentication are concerned with the genuineness of an executed document. *See, e.g.*, Federal Rule of Evidence 901(a) ("The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *see also In re Big River Grain, Inc.*, 718 F.2d 968, 971 (9th Cir. 1983) (noting that "the notary's function is to protect against recording false instruments . . ."). In contrast, Proposition 200's proof-of-citizenship requirement has nothing to do with notarization or authentication and everything to do with affirming eligibility for registration. Because the requirements of both the NVRA and Proposition 200 may be met without conflict, they can easily co-exist under the Election Clause. *See Siebold*, 100 U.S. at 386; *Foster*, 522 U.S. at 69. As both statutes may be enforced with no conflict, the NVRA does not pre-empt Proposition 200. *See id*. For that reason, I would affirm the district court's grant of summary judgment to the State of Arizona. I respectfully dissent from the majority's conclusion to the contrary.